UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

CELINE LOH XIAO HAN; VANNESSA CHAO WAN YI; SUPPHATTRA SONBANKOH; DUANGRETHAI SAESOM; JHOAM FELIPE TOLEDO VILLAMIZAR; LIZETTHE NATALIA TORRES JAIMES; SAMANTHA CAROLINA MOLINA ESPINOZA; and VICTOR JOSHUE ROCAFUERTE ALAY,

Case No. 23-cv-7786

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs,

- against -

INTEREXCHANGE, INC.; EIFFEL REDDINGS, LLC d/b/a MARIE EIFFEL MARKET; MARIE EIFFEL, LLC d/b/a MARIE EIFFEL MARKET; REDDINGS MARKET, LLC d/b/a MARIE EIFFEL MARKET; and MARIE EIFFEL,

Defendants.

-----------------------------------------------------------------------X

Plaintiffs, by their attorneys, for their complaint against the above-captioned Defendants, respectfully allege as follows, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters:

**PRELIMINARY STATEMENT**

1.     This lawsuit is brought by survivors of human trafficking seeking redress for rampant sexual assault, battery, discrimination, harassment, and wage theft perpetrated through abuse of the J-1 Summer Work Travel Program.

2.     Defendants worked in concert over multiple years to obtain exploitable foreign nationals to labor excessively in egregious working conditions at Marie Eiffel Market (the "Market"), a café located on Shelter Island, New York.

3.     Defendants induced foreign nationals, like Plaintiffs, to pay exorbitant fees to participate in a cultural exchange program through InterExchange, a J-1 sponsor company. Through this program, Defendants utilized false promises of fair treatment, and the opportunity to

live and work lawfully in the United States, to induce Plaintiffs to leave their home countries and participate in the Summer Work Travel program.

4.     InterExchange promised Plaintiffs the opportunity to immerse themselves in American culture while offsetting their travel costs in through the Summer Work Travel Program with "unparalleled support and experience."[1]

5.     Instead of providing the advertised once-in-a-lifetime experience, Defendants subjected Plaintiffs to the horror of Marie Eiffel ("Marie"), the owner of the Market, who routinely spanked Plaintiffs on the buttocks, groped female employees' breasts, choked employees, and made sexually harassing, demeaning, and discriminatory comments about their race and looks.

6.     In addition, Defendants engaged in wage theft by illegally failing to pay portions of Plaintiffs' hard-earned wages and withholding Plaintiffs' tips in violation of the N.Y. Labor Law.

7.     This action seeks all available damages including, but not limited to, compensatory and punitive damages against all Defendants for forced labor and trafficking under the Trafficking Victims Protection Reauthorization Act, ("TVPRA"); employment discrimination against all Defendants under the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq*. ("NYSHRL"); employment agency and public accommodation discrimination, and aiding-and-abetting discrimination against InterExchange under the NYSHRL; employment, employment agency and public accommodation discrimination, and aiding-and-abetting discrimination against InterExchange under the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq*. ("NYCHRL"); violations of N.Y. Labor Law and applicable regulations, spread of hour requirements against all Defendants; violations of N.Y. Labor Law and applicable regulations,

---

[1] https://www.interexchange.org/work-travel/ (last accessed September 1, 2023).

wage theft requirements; violation of N.Y. General Business Law §§ 349 and 350 against InterExchange; breach of fiduciary duty against InterExchange; negligent hiring, retention, and supervision against Eiffel Reddings, LLC, Marie Eiffel, LLC, and/or Reddings Market, LLC; and for battery against Marie.  Plaintiffs also seek recovery of their reasonable costs and attorneys' fees for each claim.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 18 U.S.C. 1595(a), and supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367. Alternatively, the Court has jurisdiction under 28 U.S.C. § 1332, as there is diversity of citizenship between the Plaintiffs and Defendants and the amount in controversy exceeds $75,000.

9.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2). InterExchange, Eiffel Reddings, Marie Eiffel, LLC, Reddings Market, LLC, and Marie Eiffel are all residents of New York. A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Southern District of New York.

## PARTIES

10.     Celine Loh Xiao Han ("Celine") is a natural person and a citizen of Malaysia. InterExchange recruited Celine for work in the United States pursuant to the J-1 visa program. After arriving in the United States in May 2022, Celine worked at the Market.

11.     Vannessa Chao Wan Yi ("Vannessa") is a natural person and a citizen of Malaysia. InterExchange recruited Vannessa for work in the United States pursuant to the J-1 visa program. After arriving in the United States in May 2022, Vannessa worked at the Market and the Marie Eiffel fashion boutique (the "Boutique").

12.     Supphattra Sonbankoh ("Lew") is a natural person and a citizen of Thailand. InterExchange recruited Lew for work in the United States pursuant to the J-1 visa program. After arriving in the United States in May 2022, Lew worked at the Market.

13.     Duangruethai Saensom ("Ai") is a natural person and a citizen of Thailand. InterExchange recruited Ai for work in the United States pursuant to the J-1 visa program. After arriving in the United States in May 2021, Ai worked at the Market.

14.     Lizetthe Natalia Torres Jaimes ("Natalia") is a natural person and a citizen of Colombia. InterExchange recruited Natalia for work in the United States pursuant to the J-1 visa program. After arriving in the United States in May 2022, Natalia worked at the Market.

15.     Jhoam Felipe Toledo Villamizar ("Felipe") is a natural person and a citizen of Colombia. InterExchange recruited Felipe for work in the United States pursuant to the J-1 visa program. After arriving in the United States in May 2022, Felipe worked at the Market.

16.     Samantha Carolina Molina Espinoza ("Samantha") is a natural person and a citizen of Ecuador. InterExchange recruited Samantha for work in the United States pursuant to the J-1 visa program. After arriving in the United States in February 2022, Samantha worked at the Market.

17.     Victor Joshue Rocafuerte Alay ("Victor") is a natural person and a citizen of Ecuador. InterExchange recruited Victor for work in the United States pursuant to the J-1 visa program. After arriving in the United States in February 2022, Victor worked at the Market.

18.     Upon information and belief, InterExchange is a not-for-profit corporation existing under the laws of the state of New York. InterExchange's principal place of business is located at 100 Wall Street, Suite 301, New York, New York.

19.     At all times relevant herein, InterExchange was a J-1 sponsor agency and subject to the federal regulations set forth in 22 C.F.R. §§ 62.1, *et seq*.

20.     As a J-1 sponsor agency, InterExchange recruited foreign students and provided them for employment to employers in the United States, including the Market.

21.     Eiffel Reddings, LLC is a limited liability company existing under the laws of the state of New York. Eiffel Reddings, LLC's principal place of business is located at 184 N. Ferry Road, Shelter Island, New York.

22.     Marie Eiffel, LLC is a limited liability company existing under the laws of the state of New York. Marie Eiffel, LLC's principal place of business is located at 181 N. Ferry Road, Shelter Island, New York.

23.     Reddings Market, LLC is a limited liability company existing under the laws of the state of New York. Reddings Market, LLC's principal place of business is located at 184 N. Ferry Road, Shelter Island, New York.

24.     Marie is a natural person and a resident of the State of New York, with business addresses located at 181 N. Ferry Road, Shelter Island Heights, New York and 184 N. Ferry Road, Shelter Island, New York.

25.     Upon information and belief, Marie is the majority member and/or managing member of Eiffel Reddings, LLC.

26.     Upon information and belief, Marie is the majority member and/or managing member of Marie Eiffel, LLC.

27.     Upon information and belief, Marie is the majority member and/or managing member of Reddings Market, LLC.

28.     Upon information and belief, Eiffel Reddings, LLC owns, operates, manages, and/or controls the Market, located at 184 N. Ferry Road, Shelter Island, New York.

29.     Upon information and belief, Marie Eiffel, LLC owns, operates, manages, and/or controls the Market, located at 184 N. Ferry Road, Shelter Island, New York.

30.     Upon information and belief, Reddings Market, LLC owns, operates, manages, and/or controls the Market, located at 184 N. Ferry Road, Shelter Island, New York.

31.     Upon information and belief, each Defendant acted in concert with each and every other Defendant, intended to and did participate in the events, acts, practices, and courses of conduct alleged herein, and was a proximate cause of damage and injury to Plaintiffs as alleged herein.

## RELEVANT NON-PARTIES

32.     Defendants employed agents, associates, representatives and/or recruiters in Asia and South America to engage in direct recruitment of J-1 visa candidates on their behalf, including Plaintiffs (the "Recruiters"). The Recruiters were and held themselves out to be agents and representatives of InterExchange.

## JURY TRIAL DEMANDED

33.     Plaintiffs demand a trial by jury on issue triable by right by a jury.

## STATEMENT OF FACTS

I.   **Background**

A.     **The J-1 Visa Program for Summer Work Travel**

34.     The Exchange Visitor Program was created by Congress through the Mutual Educational and Cultural Exchange Act of 1961, 22 U.S.C. § 2451, *et seq*. ("the Act") to encourage diplomacy and foster cultural exchange with other countries. *See also* 22 C.F.R. § 62.2 (defining Exchange Visitor Program).

35.     The Exchange Visitor Program is overseen and administered by the U.S. Department of State ("State Department").

36.     An Exchange Visitor is a foreign national who has been selected by a sponsor to participate in an Exchange Visitor Program, and who is seeking to enter or has entered the United

States on a non-immigrant J-1 visa or who has obtained J status in the United States based on a

Form DS-2019 issued by the sponsor. 22 § C.F.R. § 62.2 (defining Exchange Visitor). Exchange

Visitors are commonly referred to as "J-1 workers."

37.     The State Department administers the Exchange Visitor Program by designating

entities as "sponsors". 22 C.F.R. § 62.2 (defining Sponsor).

38.     The Exchange Visitor Program has fourteen categories of visitors, including the

Summer Work Travel program, which is the largest J-1 program category.

39.     The purpose of the Summer Work Travel program is to provide foreign students

"with opportunities to interact with U.S. citizens, experience U.S. culture while sharing their own

cultures with Americans they meet, travel in the United States, and work in jobs that require

minimal training and are seasonal or temporary in order to earn funds to help defray a portion of

their expenses." 22 C.F.R. § 62.32(b).

40.     Eligibility for the Summer Work Travel program is set forth in 22 C.F.R. §

62.4(h)(6).

**B.     InterExchange's Role as a Sponsor.**

41.     Upon information and belief, InterExchange has been designated sponsor for the

Summer Work Travel program since 1970.

42.     According to its website, InterExchange works with international organizations in

more than sixty (60) countries to recruit and screen applicants for employers in the United States.

43.     InterExchange had numerous duties and responsibilities as a Summer Work Travel

sponsor, including:

> a)  Selection of J-1 workers (22 C.F.R. § 62.10(a) and 22 C.F.R. § 62.32(d));
>
> b)  Providing pre-arrival information to J-1 workers, including clear materials describing J-1 workers rights under applicable laws (22 C.F.R. § 62.10(b)(9));

    c)  Providing J-1 workers with the Wilberforce Pamphlet on the Rights and Protections for Temporary Workers ("Wilberforce Pamphlet") (22 C.F.R. § 62.10(c)(8));[2]

    d)  Vetting potential host employers prior to placement of J-1 workers (22 C.F.R. § 62.32(n));

    e)  Ensuring placement of J-1 workers with host employers suitable for the J-1 worker's needs (22 C.F.R. § 62.32(g)); and

    f)  Continuously monitoring the J-1 workers participation in the Exchange Visitor Program (22 C.F.R. § 62.10(d)), with such monitoring including, at a minimum, monthly personal contacts with J-1 workers, to promptly and appropriately address issues affecting J-1 workers' health, safety, and welfare, providing J-1 workers with appropriate assistance (22 C.F.R. 62.32(j)).

44.    InterExchange refers to its Summer Work Travel program as "InterExchange Work & Travel USA".

45.    According to its website, "InterExchange Work & Travel USA matches U.S. based employers with English speaking international students for short term seasonal jobs across the United States."

46.    InterExchange Work & Travel USA uses two separate programs to place J-1 workers: (a) the Job Placement process and (b) the Self-Placement Process.

47.    For the Job Placement Program, InterExchange provides host employers with a dedicated Regional Manager to provide employer assistance with seasonal staff recruiting, interviewing and screening, J-1 visa processing, online orientations and training, travel arrangements, Social Security enrollment, emergency support, and general assistance.

48.    Employers who use the Job Placement program sign a "Host Employer Agreement", which allows them to search for available J-1 workers or allows Regional Managers to place J-1 workers "On Review" with employers. Employers are then able to accept or decline a

---

[2] A copy of the Wilberforce Pamphlet is attached as Exhibit "A".

J-1 worker. If a J-1 worker is accepted, the worker receives a "job offer" from the host employer, which the J-1 worker either accepts or declines.

### C.     InterExchange's Recruitment of Plaintiffs to Work at the Market

49.    During the relevant time period, Defendants hired Recruiters who used various methods to recruit workers abroad, including advertisements on websites, word of mouth, and referrals.

50.    Each Plaintiff was recruited directly by InterExchange, or indirectly through Recruiters acting as InterExchange's agents in Plaintiffs' respective home countries, to work in the J-1 Summer Work Travel program.

51.    Each Plaintiff borrowed money, in some instances thousands of dollars, from their parents in order to participate in the Summer Work Travel program for what they thought would be a once in a lifetime opportunity to live and work in the United States.

52.    Celine and Vannessa were recruited by a company in Malaysia called Infinity Abroad, which acted as a Recruiter for InterExchange.

53.    Celine and Vannessa paid a Registration Fee, Program Sponsor Fee, Visa Fee, SEVIS Fee, and Interview Fee to Infinity Abroad to participate in the Summer Work Travel program.

54.    Upon information and belief, Infinity Abroad forwarded part or all of the fees obtained from Celine and Vannessa to InterExchange.

55.    Lew and Ai were recruited by a company in Thailand called iFour Group, which acted as a recruited for InterExchange.

56.    Lew and Ai paid a Registration Fee, Program Sponsor Fee, Visa Fee, SEVIS Fee, and Interview Fee to iFour Group to participate in the Summer Work Travel program.

57.     Upon information and belief, iFour Group forwarded part or all of the fees obtained from Lew and Ai to InterExchange.

58.     Natalia and Felipe were recruited by a company in Colombia called InterLatina, which acted as a Recruiter for InterExchange.

59.     Natalia and Felipe paid a Registration Fee, Program Sponsor Fee, Visa Fee, SEVIS Fee, and Interview Fee to InterLatina to participate in the Summer Work Travel program.

60.     Upon information and belief, InterLatina forwarded part or all of the fees obtained from Natalia and Felipe to InterExchange.

61.     Samantha and Victor were recruited by a company in Ecuador called Trainee Adventure, which acted as a Recruiter for InterExchange.

62.     Samantha and Victor paid a Registration Fee, Program Sponsor Fee, Visa Fee, SEVIS Fee, and Interview Fee to Trainee Adventure to participate in the Summer Work Travel program.

63.     Upon information and belief, Trainee Adventure forwarded part or all of the fees obtained from Samantha and Victor to InterExchange.

64.     Moreover, each Plaintiff paid their own travel costs to get to the United States to participate in the Summer Work Travel program.

65.     Plaintiffs paid the foregoing fees and travel costs in reasonable reliance on the terms of their contracts with Defendants and would not have paid the extraordinary fees charged by InterExchange and/or its Recruiter Agents for the Summer Work Travel Program had they known the Defendants' promises and representations were false.

**D.      InterExchange's Assignment of Plaintiffs to Work at the Market.**

66.      Upon information and belief, each Plaintiff was matched with the Market through InterExchange's Job Placement service, whereby InterExchange matched Plaintiffs to work at the Market.

67.      Prior to beginning employment, each Plaintiff signed an InterExchange "Job Offer" to work at the Market.

68.      Each "Job Offer" stated that the Plaintiffs would work at least 65 hours per week at the Market, and that overtime laws applied.

69.      InterExchange also provided each Plaintiff with the Wilberforce Pamphlet, which alerted Plaintiffs to their rights to be treated and paid fairly; to be free from discrimination, sexual harassment, sexual exploitation, and to have a healthy and safe work place; to not be held in a job against their will; to report abuse without retaliation; and to seek justice in U.S. courts, among other things.

**II.      Plaintiffs' Employment at the Market.**

70.      Prior to beginning work, Marie made each Plaintiff sign a document entitled "New Employee Handbook." A true and accurate copy of the "New Employee Handbook" is attached as Exhibit "B".

71.      The "New Employee Handbook" admonished Plaintiffs that they would not receive any tips for work they earned in the Market if they did not complete their entire "Job Offer" contract. *See* Ex. "B" at p. 3.

72.      Moreover, the "New Employee Handbook" required each Plaintiff to sign a confidentiality agreement and a non-compete agreement, despite the fact that each Plaintiff was by design working in a low-skilled, short-term position in a foreign country.

73.      Then the nightmare began for Plaintiffs.

74.     Almost immediately following Plaintiffs' beginning of employment, Marie engaged in rampant physical and sexual assault and discrimination toward them, threatened their employment, and illegally withheld wages and tips.

**A.     Physical and Sexual Assault by Marie Against Employees.**

75.     Marie routinely sexually and physically assaulted Plaintiffs during the times they worked there.

76.     Marie's actions included (1) constantly spanking employees on the buttocks while they were alone, in front of other employees, and even in front of customers, (2) groping female employees' bodies, including their breasts, and (3) kissing employees.

77.     Marie also wrapped her hands around the neck of and choked multiple employees.

78.     Marie acted as though she believed that such egregious behavior was funny. On at least one occasion, Marie ordered an employee to record her spanking an employee on the buttocks with a bunch of parsley while she laughed at the camera, as evidenced in the photo below:



**<u>Samantha</u>**

79.     Samantha worked at the Market through the Summer Work Travel program from approximately February 2022 through May 2022.

80.     Throughout the time she worked in the Market, Marie routinely spanked Samantha on the buttocks while she was alone, with other employees, and in front of customers.

81.     Marie spanked Samantha on the buttocks more than 20 times.

82.     Marie also used to kiss often kiss Samantha, including coming up from behind while Samantha was working so that Samantha could not stop Marie from kissing her.

### Celine

83.     Celine worked at the Market through the Summer Work Program from approximately May 2022 until September 11, 2022.

84.     Throughout the time she worked in the Market, Marie routinely spanked Celine on the buttocks while she was alone, with other employees, and in front of customers.

85.     For example, on September 3, 2022, Marie Eiffel spanked Celine on the buttocks three times in front of customers.

86.     During the time she worked at the Market, Marie spanked Celine on the buttocks more than 30 times.

87.     Celine also witnessed Marie spank other employees' buttocks on many occasions, including Lew, Vannessa, and an employee named Danica.

88.     Marie also groped Celine's breasts on multiple occasions, including in front of other employees.

89.     For example, on September 7, 2022, Celine was working in the kitchen at Marie Eiffel Market when Marie came up to her and groped her body, including her breasts.

90.     Marie also choked Celine when she worked in the Market.

91.     On July 7, 2022, Marie in the Market while Celine was working at the register. Marie began to take a video while Celine was not paying attention. Upset at this, Marie wrapped her hand around Celine's neck, choking her. After doing so, Marie laughed at Celine and walked away.

**Vannessa**

92.     Vannessa worked at the Market through the Summer Work Program from approximately May 2022 until September 11, 2022.

93.     Throughout the time she worked in the Market, Marie routinely spanked Vannessa on the buttocks while she was alone, with other employees, and in front of customers.

94.     For example, on August 19, 2022, Vannessa was getting a cup of coffee at the coffee bar in the Market when Marie came beside Vannessa and started talking to a customer that was near them. Marie then slid her finger down Vannessa's pants between the cheeks of her buttocks and touched her anus.  Vannessa was so surprised that she jumped and almost spilled coffee on herself.

95.     On another occasion, Marie spanked Vannessa on the buttocks in front of other employees and said she did it so that Vannessa "would move faster just like a horse."

96.     During the time Vannessa worked at the Market, Marie spanked her on the buttocks more than 30 times.

97.     Vannessa also witnessed Marie spank other employees' buttocks on many occasions, including Lew, Celine, and Danica.

98.     Marie also groped Vannessa's breasts in front of other employees.

99.     On September 4, 2022, Vannessa was preparing food in the Market kitchen with Marie when Marie came up upon Vannessa from behind and groped Vannessa's breasts while she was cutting vegetables. Vannessa told Marie to stop. Marie then made fun of Vannessa by repeating what she was saying in a sarcastic tone and laughing. Marie then turned to another employee, laughed, and said "Look, now she is angry," about Vannessa.

100.    Marie also choked Vannessa after she asked for commissions for sales she made while working in the Boutique.

101.    On June 7, 2022, Vannessa sold almost $5,000.00 in merchandise in the Boutique. She told Marie about this, and asked about earning commission on her sales, which was permitted under her employment contract. Marie angrily responded that Vannessa had not performed well enough to prove that she deserved a commission and then suddenly wrapped her hands around Vannessa's neck, choked her, and then menacingly stated that Vannessa was "driving her [Marie] crazy!".

**Lew**

102.    Lew worked at the Market through the Summer Work Program from approximately May 2022 until September 4, 2022.

103.    Throughout the time she worked in the Market, Marie routinely spanked Lew on the buttocks while she was alone, with other employees, and in front of customers.

104.    For example, on August 17, 2022, Marie spanked Lew on the buttocks twice while she was working in the kitchen, and then laughed at Lew after doing so.

105.    Two days later, on August 19, 2022, when Lew was serving customers at the Market, Marie walked toward Lew and began to also speak with the customers. While doing so, Marie suddenly slapped Lew on the buttocks very hard, while the customer was watching. Marie then slapped Lew again on the buttocks three more times, harder each time.

106.    During the time she worked at the Market, Marie spanked Lew on the buttocks more than 30 times.

107.    Lew also witnessed Marie spank other employees' buttocks on many occasions, including Celine, Vannessa, and Danica.

**Natalia**

108.    Natalia worked at the Market through the Summer Work Program from approximately May 2022 until September 4, 2022.

16

109.    Throughout the time she worked in the Market, Marie routinely spanked Natalia on the buttocks while she was alone, with other employees, and in front of customers.

110.    For example, Marie used to come up from behind Natalia while she was doing tasks such as preparing products for sale in the Market or cutting vegetables and routinely spanked her on the buttocks.

111.    During the time she worked at the Market, Marie spanked Natalia on the buttocks more than six (6) times.

112.    Natalia also witnessed Marie spank other employees' buttocks on many occasions, including Felipe and other cashiers.

113.    Marie also physically abused Natalia by grabbing her roughly by the arms and shoving her into different places.

114.    For example, on June 26, 2022, when Marie was "teaching" Natalia how to prepare a new dessert, Marie grabbed Natalia by the arm and dragged her into the kitchen so roughly that it left bruises on her arm.

115.    Marie physically grabbed Natalia in a similar manner more than 10 times when she worked for the Market.

116.    On another occasion, Marie was "teaching" Natalia how to make chocolate mousse, by showing her how to whip heavy cream to reach a certain consistency. When the cream was ready, Marie took the cream in her hands and rubbed it on Natalia's face. When Natalia showed Marie her displeasure at her actions, Marie laughed at Natalia.

**Felipe**

117.    Felipe worked at the Market through the Summer Work Program from approximately May 2022 until September 4, 2022.

17

118.    Throughout the time he worked in the Market, Marie routinely spanked Felipe on the buttocks while he was alone, with other employees, and in front of customers.

119.    During the time he worked at the Market, Marie spanked Felipe on the buttocks more than fifteen (15) times.

120.    Felipe also witnessed Marie spank other employees' buttocks on many occasions, including Natalia.

**Ai**

121.    Ai worked at the Market through the Summer Work Program from approximately May 2021 until September 11, 2021.

122.    Throughout the time she worked in the Market, Marie routinely spanked Ai on the buttocks while she was alone, with other employees, and in front of customers.

123.    During the time she worked at the Market, Marie spanked Ai on the buttocks more than six (6) times.

124.    Marie also would put her hands on Ai's face and aggressively shake her head.

125.    On other occasions, Marie pulled Ai's hair while she was working in the kitchen.

**B.      Racist/Discriminatory/Harassing Comments by Marie Eiffel to Plaintiffs**

126.    In 2021, after Ai, an Asian woman, had been working at the Market for two weeks, Marie started to make fun of Ai's eyes, calling them "narrow." Marie also routinely pulled her eyes to make herself "appear" to be Asian in a mocking manner, and stuck her tongue out at Ai.

127.    Marie routinely referred to Celine, Vannessa, and Lew as the "Asian Girls" throughout the time they worked at Marie Eiffel Market.

128.    On July 15, 2022, in front of other employees, Marie told Celine and Lew that they "did not have the brain" to solve a customer's request.

129.   Marie told Celine that she had a "fake smile" and was not "as bubbly and expressive as Americans."

130.   Marie told Lew that her face was "uninteresting".

131.   Marie told Lew that she looked like an old lady.

132.   Marie told Celine, Vannessa, and Lew that Asians are not welcomed by white people, "just like the blacks." She also proudly told them that she asked a Black customer who is her friend "how does it feel to be on a white rich people's island?".

133.   Marie also said to Celine, Vannessa, and Lew that "Asians have a yellow face and are expressionless, just like wearing a mask and you can never understand what they are thinking because they just look at you." Marie then asked Alyssa, the Market's manager if she agreed, who responded "Marie, I don't think you should say that." In response, Marie stated "But it is true!"

134.   Marie told Celine, Vannessa, and Lew that they needed to experience "pain" to be better at their jobs.

135.   Marie called the employees "spoiled brats," accused them of being "stupid," and stated they were all "useless."

136.   Marie routinely threatened to fire any employee who tried to speak out against her conduct and mistreatment of employees.

137.   On June 18, 2022, Vannessa was working in the Boutique at Marie's direction, when Marie began screaming at her about why Vannessa was there, stating:

> "Do you know that you are such a boring person? You are boring and do not know how to have fun. Customers will not want someone like you to serve them if you are this boring! You [Vannessa] need to have fun and be wild so customers will like you, and act just like her [Marie]."

138.   Marie then continued:

"You [Vannessa] need to have fun, go and drink some wine and smoke joint! Or even have sex in the dressing room! You have a boyfriend, right? He will leave you if you are this boring do you know that? Men only like women who will have fun! Your man is going to leave for a woman who can have fun over you!"

139.    Marie laughed at Vannessa as Marie said this and then exited the store. The experience left Vannessa in tears.

140.    In July of 2022, Lew and a male housemate planned to visit New York City on her day off. Upon hearing this, Marie told Lew: "go fuck him [the housemate] in New York" at the counter in the Market in front of other employees.

141.    Marie asked the J-1 workers to make a homemade dish reflective of their culture. The purpose of this was for Marie to find new recipes she may be able to use in at the Market.

142.    Vannessa made Korean chicken and rice, which Marie did not like. In fact, Marie said "what the fuck is this? It tastes disgusting" and "go, get the fuck out of my kitchen!". Marie then approached Vannessa very closely, putting her face right up to Vanessa's and said "I am warning you, never come into the kitchen if you are not invited, just like never come to my house if I never ask you to.  If not, you are fired! You understand? Get out of my sight!" Despite saying these things, Marie then asked Vannessa for the recipe.

143.    August 13, 2022, Vannessa had been working in the Boutique. After closing, she went to the Market to give the keys to the Boutique to Marie. At the request of the Boutique's manager, Ali, Vannessa was wearing one of Marie's private label dresses to try to give customers an impression of what the dress would look like on a person. In front of the Market employees, Marie told Vannessa that she "looked terrible" in the dress and that it looked as if Vannessa "was wearing a fucking nightgown walking around." Marie then told Vannessa that the dress was designed to be worn by tall women with blonde hair, which Vannessa is not, and that *that* is why it looked ugly on her.

144.     In front of Market employees, including Plaintiffs, Marie repeatedly referred to a Market employee named Andrea as "Fuck Girl."

145.     In front of employees, Marie yelled at Ai for greeting Marie in Spanish in front of the Spanish speaking kitchen staff. Marie forbade Ai from speaking Spanish and told another employee not to "teach [Ai] Spanish, because no one wants to speak Spanish and no one wants to be born Spanish."

   **C.     Marie Eiffel's Failure to Pay Plaintiffs' Overtime, Spread of Hours and Theft of Tips**

146.     The Market bills itself on its website as a "local destination for fresh baked goods, organic produce, sandwiches, salads, prepared meals and catering" and invites patrons to "[b]ring our good home or stay and relax out back enjoying our dockside water view."[3]

147.     Accordingly, the Market is in the Hospitality Industry under the N.Y. Labor Law and 12 N.Y.C.R.R. Part 146.

148.     For virtually all of Plaintiffs' workdays during their respective work periods, Defendants required Plaintiffs to work, and Plaintiffs did work, shifts that exceeded ten (10) hours from start to finish, yet for those days, Defendants failed to pay Plaintiffs an additional hour's pay at the applicable minimum wage, as required by N.Y Labor Law and 12 N.Y.C.R.R. Part 146.

149.     As demonstrated below, the days worked by Celine, Vannessa, Natalia, and Felipe in excess of 10 hours were as follows:

**Celine Days Worked In Excess of 10 Hours**

| Month | Days Worked Total | Days Worked 10+ Hours |
|---|---|---|
| May 2022 | 6 | 5 |
| June 2022 | 23 | 23 |
| July 2022 | 25 | 24 |
| August 2022 | 26 | 23 |
| September 2022 | 9 | 9 |

---

[3] https://marieeiffelmarket.com/ (last accessed September 1, 2023).

**Vannessa Days Worked in Excess of 10 Hours**

| Month | Days Worked Total | Days Worked 10+ Hours |
|---|---|---|
| May 2022 | 6 | 5 |
| June 2022 | 23 | 23 |
| July 2022 | 25 | 24 |
| August 2022 | 26 | 23 |
| September 2022 | 9 | 9 |

**Natalia Days Worked in Excess of 10 Hours**

| Month | Days Worked Total | Days Worked 10+ Hours |
|---|---|---|
| April 2022 | 5 | 3 |
| May 2022 | 24 | 19 |
| June 2022 | 23 | 23 |
| July 2022 | 27 | 27 |
| August 2022 | 26 | 26 |
| September 2022 | 4 | 4 |

**Victor Days Worked in Excess of 10 Hours**

| Month | Days Worked Total | Days Worked 10+ Hours |
|---|---|---|
| April 2022 | 6 | 5 |
| May 2022 | 25 | 19 |
| June 2022 | 23 | 23 |
| July 2022 | 27 | 27 |
| August 2022 | 26 | 26 |
| September 2022 | 4 | 4 |

150.    Upon information and belief, the other Plaintiffs each similarly worked in excess of 10 hours almost every day they worked at the Market.

151.    In addition to the InterExchange "Job Offer," Marie required each Plaintiff to sign numerous documents to work in the Market.

152.    One of the documents that Marie required Plaintiffs to sign was the "New Employee Handbook," which each Plaintiff received upon arrival.

153.    Consistent with the New Employee Handbook, each Plaintiff was told they would not receive their tips unless they completed the full contract (i.e., worked the entire Summer Work Travel program).

154.    Upon information and belief, Plaintiffs did not receive tips until completion of their respective Summer Work Travel Programs.

155.    Moreover, Marie, either herself directly or through other managers at the Market, including Jason, who was Marie's boyfriend, and Alyssa, the Market's manager, routinely threatened to withhold Plaintiffs' tips at the end of the Summer Work Travel program if, in their discretion, they did not believe each respective Plaintiff had worked hard enough.

156.    For example, on June 7, 2022, Alyssa told Celine and Lew that they would only receive three (3) percent of the debit tips because Marie did not like how they took care of customers, while other employees were entitled to receive ten (10) percent of the debit tips.

157.    On the same day, Jason told Vannessa that she, Celine, and Lew would receive lower tips than the other employees.

158.    Upon information and belief, Marie kept cash tips for herself that were supposed to have been distributed to Plaintiffs and failed and refused to provide Plaintiffs with an accurate calculation of the cash tips that the Market, in fact, received.

159.    Upon information and belief, Marie kept debit and credit card tips for herself that were supposed to have been distributed to Plaintiffs, and failed and refused to provide Plaintiffs with an accurate calculation of the debit and credit tips that the Market, in fact, received.

160.    For example, on at least one occasion in the Summer of 2022 Marie told employees that she "lost" the cash tips that the Market had collected for that day.

161.    On other occasions, Marie threatened employees that they would not receive any cash tips if they questioned her about the amount of tips that the Market received. Marie threatened

to fire any employee who asked again about tips—including the amount of tips received on a given day or the total amount of tips that each employee was entitled to receive.

### D.    InterExchange's Refusal to Investigate Marie Eiffel's Actions

162.    InterExchange was required to continuously monitoring Plaintiffs' participation in the Exchange Visitor Program (22 C.F.R. § 62.10(d)), with such monitoring including, at a minimum, monthly personal contacts with Plaintiffs, to promptly and appropriately address any issues affecting J-1 workers' health, safety, and welfare, and provide J-1 workers with appropriate assistance (22 C.F.R. 62.32(j)) according to the J-1 regulations.

163.    Upon information and belief, Plaintiffs each attempted to complain to InterExchange about Marie's treatment of them, however, InterExchange failed to properly monitor and/or intervene to stop Marie's sexual violence, harassment, discrimination, and violation of the N.Y. Labor Law requirements.

164.    InterExchange did not take action with regard to Plaintiffs' complaints.

165.    For example, with respect to Celine and Vannessa, each specifically notified InterExchange of the issues with Marie, and requested that InterExchange provide them with a different placement because of how Marie was treating them.

166.    In response, InterExchange provided options for placements that were approximately 1.5 hours from Shelter Island, where Celine and Vannessa were living, and without providing any option for transportation to and from the assignments.

167.    InterExchange did nothing to address Marie's illegal and traumatizing conduct towards them.

168.    InterExchange similarly ignored the complaints of the other Plaintiffs, provided them with unworkable and unreasonable solutions, and/or failed to take action to stop Marie's egregious and illegal behavior.

24

169.    Upon information and belief, despite having actual and/or constructive knowledge of Marie's egregious behavior, InterExchange *continues* to place J-1 workers at the Market, under the supervision of a known abuser, harasser, and violator of law.

### FIRST CLAIM FOR RELIEF

(By Each Plaintiff Against All Defendants for Violations of the Trafficking Victims Protection Reauthorization Act (the "TVPRA"))

170.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

171.    Plaintiffs bring this claim against all Defendants.

172.    Plaintiffs are all victims of forced labor, involuntary servitude, and human trafficking in violation of 18 U.S.C. §§ 1589, 1590, 1593A, and 1594.

173.    Defendants attempted to and did subject Plaintiffs to forced labor in violation of 18 U.S.C. § 1589.

174.    Defendants knowingly obtained labor and services of Plaintiffs through serious harm and threats of serious harm, including physical and economic harm, in violation of 18 U.S.C. § 1589(a)(2).

175.    Defendants knowingly obtained the labor and services of Plaintiffs through a scheme, plan, or pattern which, in the totality of the circumstances, was intended to cause and did cause Plaintiffs to believe that they would suffer serious harm if they were to leave the employ of the Defendants in violation of 18 U.S.C. § 1589(a)(4).

176.    Defendants knowingly recruited, harbored, transported, and/or obtained Plaintiffs for labor and services in violation of laws prohibiting forced labor, in violation of 18 U.S.C. § 1590.

177.    Defendants knowingly benefitted financially and/or by receiving the value of labor from Plaintiffs through their participation in a venture which Defendants knew or should have known was engaged in violation of the TVPRA, or in reckless disregard of the fact that the venture was in violation of the TVPRA, in violation of 18 U.S.C. §§ 1589, 1593A, and 1595.

178.    Defendants intentionally entered into contracts with no intention of complying with the terms promised and ignored the various complaints made by Plaintiffs regarding the coercive and abusive conditions of their employment.

179.    As a result of Defendants' venture, Defendants received and did knowingly receive numerous benefits including:

    a)  having J-1 workers recruited from abroad;

    b)  receiving application and recruitment fees from J-1 workers such as Plaintiffs;

    c)  rental income from Plaintiffs;

    d)  having cheap and easily exploitable labor available to staff Defendants' businesses.

180.    Defendants and the Recruiters conspired to commit the violations of the TVPRA described herein, in violation of 18 U.S.C. § 1594. Defendants worked in partnership with the Recruiters to implement a scheme of fraudulent recruitment practices, designed to induce Plaintiffs into making significant financial investments to enter into employment contracts with Defendants abroad. Defendants used the financial vulnerability created by this recruitment scheme, along with the restrictive terms of the J-1 program, to obtain the labor of Plaintiffs through serious harm and/or the threat of serious harm.

181.    Plaintiffs suffered injury as a proximate result of these actions.

182.     Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial and any other relief deemed appropriate, including reasonable costs and attorneys' fees.

### SECOND CLAIM FOR RELIEF

(By Each Plaintiff Against All Defendants for Violations of the New York State Human Rights Law - Employers)

183.     Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

184.     At all times relevant herein, Defendants were Plaintiffs' joint employer under the New York State Human Rights Law.

185.     Plaintiffs were employees under the New York State Human Rights Law.

186.     Under N.Y. Executive Law § 296(1)(a), it is an unlawful discriminatory practice for an employer, because of an individual's race, color, national origin, or sex to discriminate against such person in terms, conditions, or privileges of employment.

187.     Under N.Y. Executive Law § 296(1)(h), it is unlawful for an employer to subject any individual to harassment because of an individual's race, color, national origin, citizenship status or immigration status, and/or sex.

188.     Defendants created and maintained a hostile work environment at the Market and Boutique by permitting and allowing Marie to:

   a) Sexually harass and assault Plaintiffs and others on a routine basis by spanking their buttocks, sliding a finger in between the cheeks of an employee's buttocks and touching her anus, and groping female employees' breasts;

   b) Physically assaulting employees by choking them, grabbing their arms in such a manner that left bruises, pulling employees' hair, and aggressively rubbing food on an employee's face;

   c) Making harassing and disparaging comments about employees' race, color, and ethnical characteristics;

27

d) Making overtly sexual and lewd comments about and to female employees;

e) Making disparaging comments about female employees' looks;

189.    As a direct and proximate cause of Defendants' unlawful and discriminatory conduct in violation of the New York State Human Rights Law, Plaintiffs have suffered and continue to suffer mental anguish and emotional distress including depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

190.    Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF

(By Each Plaintiff Against InterExchange for Violations of the New York State Human Rights Law – Employment Agency)

191.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

192.    At all times relevant herein, InterExchange was an employment agency under the New York State Human Rights Law, N.Y. Executive Law § 292(2).

193.    Plaintiffs were employees under the New York State Human Rights Law.

194.    Under N.Y. Executive Law § 296(1)(b), it is an unlawful discriminatory practice for an employment agency, to discriminate against any individual because of their race, color, national origin, or sex, in receiving, classifying, disposing, or otherwise acting upon applications for its services or in referring an applicant or applicants to an employer or employers.

195.    Under N.Y. Executive Law § 296(1)(h), it is unlawful for an employment agency to subject any individual to harassment because of an individual's race, color, national origin, citizenship status or immigration status, and/or sex.

196.    As an employment agency, InterExchange subjected Plaintiffs to harassment and a hostile work environment at the Market and Boutique by permitting and allowing Marie to:

a)  Sexually assault Plaintiffs and others on a routine basis by spanking their buttocks, sliding a finger in between the cheeks of an employee's buttocks and touching her anus, and groping female employees' breasts;

b)  Physically assault employees by choking them, grabbing their arms in such a manner that left bruises, pulling employees' hair, and aggressively rubbing food on an employee's face;

c)  Make harassing and disparaging comments about employees' race, color, and ethnical characteristics;

d)  Make overtly sexual and lewd comments about and to female employees;

e)  Make disparaging comments about female employees' looks;

197.    InterExchange knew or should have known about Marie's actions based upon Plaintiffs' complaints about Marie's abusive behavior.

198.    InterExchange had a duty to ensure that Plaintiffs' placement to work at the Market through the Summer Work Travel Program was suitable for Plaintiffs' needs (22 C.F.R. § 62.32(g)).

199.    Interexchange had a duty to continuously monitor Plaintiffs' participation in the Summer Work Travel program (22 C.F.R. § 62.10(d)), with such monitoring including, at a minimum, monthly personal contacts with Plaintiffs, to promptly and appropriately address issues affecting Plaintiffs' health, safety, and welfare, and to provide Plaintiffs with appropriate assistance (22 C.F.R. 62.32(j)).

200.    As set forth herein, InterExchange utterly failed in its obligations under the applicable regulations with regard to Plaintiffs.

201.    As a direct and proximate cause of InterExchange's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, Plaintiffs have suffered and

continue to suffer mental anguish and emotional distress including depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

202.    Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

### FOURTH CLAIM FOR RELIEF

(By Each Plaintiff Against InterExchange for Violations of the New York State Human Rights Law – Public Accommodation)

203.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

204.    At all times relevant herein, InterExchange was a public accommodation under N.Y. Executive Law § 292(9).

205.    Plaintiffs sought InterExchange's services as a public accommodation under the New York State Human Rights Law.

206.    Under N.Y. Executive Law § 296(2)(a), it is an unlawful discriminatory practice for a public accommodation, directly or indirectly, to refuse, withhold from, or deny to any individual because of their race, color, national origin, or sex, any of the accommodations, advantages, facilities, or privileges thereof.

207.    As a public accommodation, InterExchange subjected Plaintiffs to harassment and a hostile work environment at the Market and Boutique by permitting and allowing Marie to:

  a)  Sexually assault Plaintiffs and others on a routine basis by spanking their buttocks, sliding a finger in between the cheeks of an employee's buttocks and touching her anus, and groping female employees' breasts;

  b)  Physically assault employees by choking them, grabbing their arms in such a manner that left bruises, pulling employees' hair, and aggressively rubbing food on an employee's face;

    c) Make harassing and disparaging comments about employees' race, color, and ethnical characteristics;

    d) Make overtly sexual and lewd comments about and to female employees;

    e) Make disparaging comments about female employees' looks;

208.    InterExchange knew or should have known about Marie's actions based upon Plaintiffs' complaints about Marie's abusive behavior.

209.    InterExchange had a duty to ensure that Plaintiffs' placement to work at the Market through the Summer Work Travel Program was suitable for Plaintiffs' needs (22 C.F.R. § 62.32(g)).

210.    InterExchange had a duty to continuously monitor Plaintiffs' participation in the Summer Work Travel program (22 C.F.R. § 62.10(d)), with such monitoring including, at a minimum, monthly personal contacts with Plaintiffs, promptly and appropriately addressing issues affecting Plaintiffs' health, safety, and welfare, and providing Plaintiffs with appropriate assistance (22 C.F.R. 62.32(j)).

211.    As set forth herein, InterExchange utterly failed in its obligations under the applicable regulations with regard to Plaintiffs.

212.    As a direct and proximate cause of InterExchange's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, Plaintiffs have suffered and continue to suffer mental anguish and emotional distress including depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

213.    Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF

(By Each Plaintiff Against InterExchange for Violations of the New York City Human Rights
Law – Employer)

214.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth
more fully herein.

215.    At all times relevant herein, InterExchange was Plaintiffs' employer under the New
York City Human Rights Law. New York City Admin. Code § 8-101, *et seq.*

216.    Under New York City Admin. Code § 8-107(1), it is an unlawful discriminatory
practice for an employer or agent thereof, because of the actual or perceived race, color, national
origin, or gender of any person, to discriminate against such person in compensation or in terms,
conditions or privileges of employment.

217.    InterExchange created and maintained a hostile work environment at the Market
and Boutique by permitting and allowing Marie to:

   a)  Sexually assault Plaintiffs and others on a routine basis by spanking their
       buttocks, sliding a finger in between the cheeks of an employee's buttocks and
       touching her anus, and groping female employees' breasts;

   b)  Physically assaulting employees by choking them, grabbing their arms in such
       a manner that left bruises, pulling employees' hair, and aggressively rubbing
       food on an employee's face;

   c)  Making harassing and disparaging comments about employees' race, color, and
       ethnical characteristics;

   d)  Making overtly sexual and lewd comments about and to female employees;

   e)  Making disparaging comments about female employees' looks;

218.    InterExchange had a duty to ensure that Plaintiffs' placement to work at the Market
through the Summer Work Travel Program was suitable for Plaintiffs' needs (22 C.F.R. §
62.32(g)).

219.    InterExchange had a duty to continuously monitor Plaintiffs' participation in the Summer Work Travel program (22 C.F.R. § 62.10(d)), with such monitoring including, at a minimum, monthly personal contacts with Plaintiffs, promptly and appropriately addressing issues affecting Plaintiffs' health, safety, and welfare, and providing Plaintiffs with appropriate assistance (22 C.F.R. 62.32(j)).

220.    As set forth herein, InterExchange utterly failed in its obligations under the applicable regulations with regard to Plaintiffs.

221.    As a direct and proximate cause of InterExchange's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, Plaintiffs have suffered and continue to suffer mental anguish and emotional distress including depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

222.    Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

### SIXTH CLAIM FOR RELIEF

(By Each Plaintiff Against all InterExchange for Violations of the New York City Human Rights Law – Employment Agency)

223.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

224.    At all times relevant herein, InterExchange was an employment agency under the New York City Human Rights Law. New York City Admin. Code § 8-101.

225.    As an employment agency, InterExchange subjected Plaintiffs to harassment and a hostile work environment at the Market and Boutique by permitting and allowing Marie to:

a) Sexually assault Plaintiffs and others on a routine basis by spanking their buttocks, sliding a finger in between the cheeks of an employee's buttocks and touching her anus, and groping female employees' breasts;

b) Physically assault employees by choking them, grabbing their arms in such a manner that left bruises, pulling employees' hair, and aggressively rubbing food on an employee's face;

c) Make harassing and disparaging comments about employees' race, color, and ethnical characteristics;

d) Make overtly sexual and lewd comments about and to female employees;

e) Make disparaging comments about female employees' looks;

226.   InterExchange knew or should have known about Marie's actions based upon Plaintiffs' complaints about Marie's abusive behavior.

227.   InterExchange had a duty to ensure that Plaintiffs' placement to work at the Market through the Summer Work Travel Program was suitable for Plaintiffs' needs (22 C.F.R. § 62.32(g)).

228.   InterExchange had a duty to continuously monitor Plaintiffs' participation in the Summer Work Travel program (22 C.F.R. § 62.10(d)), with such monitoring including, at a minimum, monthly personal contacts with Plaintiffs, promptly and appropriately addressing issues affecting Plaintiffs' health, safety, and welfare, and providing Plaintiffs with appropriate assistance (22 C.F.R. 62.32(j)).

229.   As set forth herein, InterExchange utterly failed in its obligations under the applicable regulations with regard to Plaintiffs.

230.   As a direct and proximate cause of InterExchange's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, Plaintiffs have suffered and continue to suffer mental anguish and emotional distress including depression, humiliation,

embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

231.    Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

### SEVENTH CLAIM FOR RELIEF

(By Each Plaintiff Against InterExchange for Violations of the New York City Human Rights Law – Public Accommodation)

232.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

233.    At all times relevant herein, InterExchange was public accommodation under the New York City Human Rights Law. New York City Admin. Code § 8-101.

234.    As a public accommodation, InterExchange subjected Plaintiffs to harassment and a hostile work environment at the Market and Boutique by permitting and allowing Marie to:

   a)  Sexually assault Plaintiffs and others on a routine basis by spanking their buttocks, sliding a finger in between the cheeks of an employee's buttocks and touching her anus, and groping female employees' breasts;

   b)  Physically assault employees by choking them, grabbing their arms in such a manner that left bruises, pulling employees' hair, and aggressively rubbing food on an employee's face;

   c)  Make harassing and disparaging comments about employees' race, color, and ethnical characteristics;

   d)  Make overtly sexual and lewd comments about and to female employees;

   e)  Make disparaging comments about female employees' looks;

235.    InterExchange knew or should have known about Marie's actions based upon Plaintiffs' complaints to InterExchange about Marie's abusive behavior.

236.    InterExchange had a duty to ensure that Plaintiffs' placement to work at the Market through the Summer Work Travel Program was suitable for Plaintiffs' needs (22 C.F.R. § 62.32(g)).

237.    InterExchange had a duty to continuously monitor Plaintiffs' participation in the Summer Work Travel program (22 C.F.R. § 62.10(d)), with such monitoring including, at a minimum, monthly personal contacts with Plaintiffs, promptly and appropriately addressing issues affecting Plaintiffs' health, safety, and welfare, and providing Plaintiffs with appropriate assistance (22 C.F.R. 62.32(j)).

238.    As set forth herein, InterExchange utterly failed in its obligations under the applicable regulations with regard to Plaintiffs.

239.    As a direct and proximate cause of InterExchange's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, Plaintiffs have suffered and continue to suffer mental anguish and emotional distress including depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

240.    Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

## EIGHTH CLAIM FOR RELIEF

(By Each Plaintiff Against InterExchange for Aiding and Abetting Violations of the New York State Human Rights Law)

241.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

242.    Under N.Y. Executive Law § 296(6), it is unlawful for anyone to aid, abet, incite, compel or coerce any of the acts forbidden under this article, or to attempt to do so.

243.    InterExchange aided and abetted Marie's violations of the New York State Human Rights Law by failing to remedy, correct, or otherwise take action in response to Plaintiffs' complaints about the rampant abuse that they were facing at their placement in the Market.

244.    InterExchange knew or should have known about Marie's actions based upon Plaintiffs' complaints to InterExchange about Marie's abusive behavior.

245.    InterExchange had a duty to ensure that Plaintiffs' placement to work at the Market through the Summer Work Travel Program was suitable for Plaintiffs' needs (22 C.F.R. § 62.32(g)).

246.    InterExchange had a duty to continuously monitor Plaintiffs' participation in the Summer Work Travel program (22 C.F.R. § 62.10(d)), with such monitoring including, at a minimum, monthly personal contacts with Plaintiffs, promptly and appropriately addressing issues affecting Plaintiffs' health, safety, and welfare, and providing Plaintiffs with appropriate assistance (22 C.F.R. 62.32(j)).

247.    As set forth herein, InterExchange utterly failed in its obligations under the applicable regulations with regard to Plaintiffs.

248.    As a direct and proximate cause of InterExchange's unlawful and discriminatory conduct in violation of the New York State Human Rights Law, Plaintiffs have suffered and continue to suffer mental anguish and emotional distress including depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

249.    Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

## NINTH CLAIM FOR RELIEF

(By Each Plaintiff Against InterExchange for Aiding and Abetting Violations of the New York City Human Rights Law)

250.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

251.    Under N.Y.C. Admin. § Code 8-101, it is unlawful for anyone to aid, abet, incite, compel or coerce any of the acts forbidden under this article, or to attempt to do so.

252.    InterExchange aided and abetted Marie's violations of the New York State Human Rights Law by failing to remedy, correct, or otherwise take action in response to Plaintiffs' complaints about the rampant abuse that they were facing at their placement in the Market.

253.    InterExchange knew or should have known about Marie's actions based upon Plaintiffs' complaints about Marie's abusive behavior.

254.    InterExchange had a duty to ensure that Plaintiffs' placement to work at the Market through the Summer Work Travel Program was suitable for Plaintiffs' needs (22 C.F.R. § 62.32(g)).

255.    InterExchange had a duty to continuously monitor Plaintiffs' participation in the Summer Work Travel program (22 C.F.R. § 62.10(d)), with such monitoring including, at a minimum, monthly personal contacts with Plaintiffs, promptly and appropriately addressing issues affecting Plaintiffs' health, safety, and welfare, and providing Plaintiffs with appropriate assistance (22 C.F.R. 62.32(j)).

256.    As set forth herein, InterExchange utterly failed in its obligations under the applicable regulations with regard to Plaintiffs.

257.    As a direct and proximate cause of InterExchange's unlawful and discriminatory conduct in violation of the New York City Human Rights Law, Plaintiffs have suffered and

continue to suffer mental anguish and emotional distress including depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

258.    Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

## TENTH CLAIM FOR RELIEF

(Against All Defendants for Violations of New York Labor Law – Spread of Hours)

259.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

260.    N.Y. Labor Law § 652(1) and 12 N.Y.C.R.R. § 146-1.6 provide that an employee working in the hospitality industry shall receive one hour's pay at the minimum hourly wage rate for any day worked in which the spread of hours exceeds ten hours.

261.    Defendants are employers within the meaning of N.Y. Labor Law and the N.Y.C.R.R.

262.    Plaintiffs were hospitality employees within the meaning of N.Y. Labor Law and the N.Y.C.R.R.

263.    Plaintiffs are entitled to spread of hours pay in the amount of one hour's pay at the then applicable minimum hourly wage rate for any day worked in which their spread of hours exceeded ten hours.

264.    Upon information and belief, Plaintiffs regularly worked in excess of ten hours on the days they worked for the Market.

265.    Defendants never paid Plaintiffs the requisite spread of hours pay during their entire course of employment with Defendants.

266.    Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

## ELEVENTH CLAIM FOR RELIEF

(Against All Defendants for Violations of New York Labor Law – Theft of Tips)

267.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

268.    Under N.Y. Labor Law § 196-d:

> No employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee.

269.    Defendants are employers within the meaning of N.Y. Labor Law and the N.Y.C.R.R.

270.    Plaintiffs were hospitality employees within the meaning of N.Y. Labor Law and the N.Y.C.R.R.

271.    During the course of Plaintiffs' employment in the Market, patrons provided cash and/or credit/debit tips to Plaintiffs.

272.    Defendants failed to pay tips in appropriate intervals in violation of N.Y. Labor Law and applicable regulations.

273.    Defendants never provided Plaintiffs with an accurate accounting of the cash and/or credit/debit tips that Defendants received from customers.

274.    Upon information and belief, Marie and other managers unlawfully retained a portion of the cash and/or debit/credit tips that were intended for Plaintiffs and other employees in violation of N.Y. Labor Law § 196-d and applicable regulations.

275.    Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

## TWELFTH CLAIM FOR RELIEF

(By Each Plaintiff Against InterExchange for Violation of N.Y. Gen. Bus. Law § 349)

276.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

277.    N.Y. Gen. Bus. Law § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce in the furnishing of any service in this state…".

278.    InterExchange's conduct alleged herein constituted recurring, "unlawful" deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349 and, as such, Plaintiffs seek monetary damages and the entry of preliminary and permanent injunctive relief against InterExchange, enjoining it from inaccurately describing, marketing, and promoting the services it provides as a Sponsor to J-1 workers, and to install proper controls and monitoring to ensure that providing the services required of a Sponsor under federal law and applicable regulations.

279.    InterExchange misleadingly, inaccurately, and deceptively presented the services it allegedly provides to J-1 workers to consumers, including Plaintiffs.

280.    InterExchange's improper consumer-oriented conduct, including advertising and marketing its services to potential J-1 workers, is misleading in a material way in that it, *inter alia*, induced Plaintiffs and others to borrow money to incur significant expenses and other costs to participate in the Summer Work Travel program when, absent such conduct, they would not have.

281.    InterExchange made the untrue or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

282.    Plaintiffs have been injured because they paid a premium to participate in the Summer Work Travel program under the belief that InterExchange would monitor their

placements when InterExchange had no intention of doing so, and in fact, did not. Accordingly, Plaintiffs received less than what they bargained or paid for.

283.     InterExchange's marketing and advertising of its services to potential J-1 workers induced Plaintiffs and others to pay a premium price to participate in the Summer Work Travel program.

284.     As a direct result of InterExchange's unlawful deceptive acts and practices, Plaintiffs have been damaged.

285.     Plaintiffs are entitled to monetary and compensatory damages, injunctive relief, restitution, and disgorgement of all monies obtained by means of InterExchange's unlawful conduct, interest, and attorneys' fees and costs.

<u>THIRTEENTH CLAIM FOR RELIEF</u>

(By Each Plaintiff Against InterExchange for Violation of N.Y. Gen. Bus. Law § 350)

286.     Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

287.     N.Y. Gen. Bus. Law § 350 provides, in part:

> False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

288.     N.Y. Gen. Bus. Law § 350-a(1) further provides, in part:

> The term 'false advertising' means advertising, including labelling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in any material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in light of such representations with respect to the commodity or employment ot which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary and usual.

> For purposes of this article, with respect to the advertising of an employment opportunity, it shall be deemed 'misleading in a material respect' to either fail to reveal whether the employment available or being offered…is on a commission rather than a fixed salary basis and, if so, whether the salaries advertised are only obtainable if sufficient commissions are earned.

289.    InterExchange's marketing and advertisements contain untrue and materially misleading statements concerning the services it offers to potential J-1 workers.

290.    Plaintiffs have been injured because they relied on InterExchange's marketing and advertising and paid a premium to participate in the Summer Work Travel program. Accordingly, Plaintiffs received less than what they bargained or paid for.

291.    InterExchange's marketing and advertising induced Plaintiffs and others to participate in the Summer Work Travel program.

292.    InterExchange made untrue and misleading statements about the services it offered to potential J-1 workers, including Plaintiffs, willfully, wantonly, and with reckless disregard for the truth.

293.    InterExchange's conduct constituted multiple, separate violations of N.Y. Gen. Bus. Law § 350.

294.    InterExchange's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers participating in, or seeking to participate in, the Summer Work Travel program with InterExchange as the Sponsor, were and continue to be exposed to InterExchange's material misrepresentation.

295.    As a result of InterExchange's recurring, unlawful deceptive acts and practices, Plaintiffs are entitled to monetary and compensatory damages, injunctive relief, restitution and disgorgement of all monies obtained by means of InterExchange's unlawful conduct, interest, and attorneys' fees and costs.

296.     Plaintiffs seek actual damages under N.Y. Gen. Business Law § 350 or statutory damages, whichever is greater.

## FOURTEENTH CLAIM FOR RELIEF

(By Each Plaintiff Against InterExchange for Negligent Misrepresentation)

297.     Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

298.     InterExchange, by virtue of its relationship with Plaintiffs, undertook a special duty to monitor and ensure that Plaintiffs' rights, including the right to be free from sexual violence, discrimination, and harassment were not violated.

299.     InterExchange, through its own actions and the actions of its agents, falsely represented to Plaintiffs that it would monitor that Plaintiffs' rights, including the right to be free from sexual violence, discrimination, and harassment were not violated.

300.     InterExchange knew that Plaintiffs, as J-1 visa workers who were in a foreign country, many for the first time, relied on the representations by InterExchange and/or its agents.

301.     InterExchange knew that Plaintiffs would not have paid to be in the Summer Work program had they known that they would be subjected to sexual violence, discrimination, and harassment.

302.     Plaintiffs reasonably relied on the representations by InterExchange and/or its agents when they paid money to participate in the Summer Work program.

303.     InterExchange misrepresented that it would ensure that Plaintiffs' placement to work at the Market through the Summer Work Travel Program was suitable for Plaintiffs' needs.

304.     InterExchange misrepresented that it would continuously monitor Plaintiffs' participation in the Summer Work Travel program, with such monitoring including, at a minimum,

monthly personal contacts with Plaintiffs, promptly and appropriately addressing issues affecting Plaintiffs' health, safety, and welfare, and providing Plaintiffs with appropriate assistance.

305.    InterExchange breached its duty when it failed to monitor, remedy, correct, and/or take action in response to Plaintiffs' complaints about Marie.

306.    Specifically, InterExchange breached its duty when it failed to monitor, remedy, correct, and/or take action by permitting and allowing Marie to:

a)  Sexually assault Plaintiffs and others on a routine basis by spanking their buttocks, sliding a finger in between the cheeks of an employee's buttocks and touching her anus, and groping female employees' breasts;

b)  Physically assault employees by choking them, grabbing their arms in such a manner that left bruises, pulling employees' hair, and aggressively rubbing food on an employee's face;

c)  Make harassing and disparaging comments about employees' race, color, and ethnical characteristics;

d)  Make overtly sexual and lewd comments about and to female employees;

e)  Make disparaging comments about female employees' looks;

f)  Permitting Marie's non-compliance with N.Y. Labor Law and N.Y.C.R.R. requirements.

307.    As a direct and proximate cause of InterExchange's actions, Plaintiffs have suffered and continue to suffer mental anguish and emotional distress including depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

308.    Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

**FIFTEENTH CLAIM FOR RELIEF**

(By Each Plaintiff Against InterExchange for Breach of Fiduciary Duty)

309.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

310.    InterExchange, by virtue of its relationship with Plaintiffs, owed a fiduciary duty to Plaintiffs to monitor and ensure that Plaintiffs' rights, including the right to be free from sexual violence, discrimination, and harassment were not violated.

311.    InterExchange breached its duty when it failed to monitor, remedy, correct, and/or take action when it knew or should have known about Marie's actions.

312.    InterExchange had a duty to ensure that Plaintiffs' placement to work at the Market through the Summer Work Travel Program was suitable for Plaintiffs' needs (22 C.F.R. § 62.32(g)).

313.    InterExchange had a duty to continuously monitoring Plaintiffs' participation in the Summer Work Travel program (22 C.F.R. § 62.10(d)), with such monitoring including, at a minimum, monthly personal contacts with Plaintiffs, promptly and appropriately addressing issues affecting Plaintiffs' health, safety, and welfare, and providing Plaintiffs with appropriate assistance (22 C.F.R. 62.32(j)).

314.    Specifically, InterExchange breached its duty when it failed to monitor, remedy, correct, and/or take action after Marie:

   a)  Sexually assaulted Plaintiffs and others on a routine basis by spanking their buttocks, sliding a finger in between the cheeks of an employee's buttocks and touching her anus, and groping female employees' breasts;

   b)  Physically assaulted employees by choking them, grabbing their arms in such a manner that left bruises, pulling employees' hair, and aggressively rubbing food on an employee's face;

c) Made harassing and disparaging comments about Plaintiffs' race, color, and ethnical characteristics;

d) Make overtly sexual and lewd comments about and to female employees;

e) Make disparaging comments about female employees' looks;

f) Permitting Marie's non-compliance with N.Y. Labor Law and N.Y.C.R.R. requirements.

315.    As a direct and proximate cause of InterExchange's actions, Plaintiffs have suffered and continue to suffer mental anguish and emotional distress including depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

316.    Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

## SIXTEENTH CLAIM FOR RELIEF

(By Each Plaintiff Against Eiffel Reddings, LLC, Marie Eiffel, LLC, and/or Reddings Market, LLC for Negligent Hiring, Retention, and Supervision)

317.    Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

318.    Eiffel Reddings, LLC, Marie Eiffel, LLC, and/or Reddings Market, LLC had an employer-employee relationship with Marie.

319.    Eiffel Reddings, LLC, Marie Eiffel, LLC, and/or Reddings Market, LLC knew or should have known that Marie had a propensity to engage in sexual violence, discrimination, and harassment.

320.    Despite this knowledge, Eiffel Reddings, LLC, Marie Eiffel, LLC, and/or Reddings Market, LLC permitted Marie to perpetrate sexual violence, discrimination, and harassment upon Plaintiffs.

321.   As a direct and proximate cause of Eiffel Reddings, LLC, Marie Eiffel, LLC, and/or Reddings Market, LLC's actions, Plaintiffs have suffered and continue to suffer mental anguish and emotional distress including depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

322.   Plaintiffs are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

## SEVENTEENTH CLAIM FOR RELIEF

(By Each Plaintiff Except Ai, Samantha, and Victor Against Marie for Battery)

323.   Plaintiffs repeat, reallege and incorporate all previous paragraphs as if set forth more fully herein.

324.   On dozens of occasions, Marie slapped the buttocks, groped the breasts, choked, and otherwise intentionally made bodily contact in an offensive manner with each Plaintiff except Victor.

325.   As described above:

a) Marie slapped Celine on the buttocks more than 30 times, groped her breasts multiple times, and choked her.

b) Marie slapped Vannessa on the buttocks more than 30 times, groped her breasts, slid her finger down the cheeks of Vannessa's buttocks and touched her anus.

c) Marie slapped Lew on the buttocks more than 30 times, groped her breasts, and choked her.

d) Marie slapped Natalia on the buttocks more than six times, violently grabbed her by the arms, and rubbed food on her face.

e) Marie slapped Felipe on the buttocks more than 15 times.

326.   As a direct and proximate cause of Marie's actions, Celine, Vannessa, Lew, Natalia, Felipe, and Ai have suffered and continue to suffer mental anguish and emotional distress

including depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

327.   Celine, Vannessa, Lew, Natalia, and Felipe are entitled to recovery of all damages permitted under the law and an award of reasonable attorneys' fees and costs.

**WHEREFORE**, Plaintiffs respectfully request judgment against Defendants on each claim for relief as follows:

     a.   Actual damages, including disgorgement and/or restitution of any monies paid by Plaintiffs for participating in the Summer Work Travel Program, or statutory damages, whichever is greater;

     b.   Compensatory damages;

     c.   Punitive damages;

     d.   Liquidated and other damages available under the N.Y. Labor Law;

     e.   Injunctive relief;

     f.   Awarding Plaintiffs reasonable attorneys' fees, costs, and disbursements;

     g.   Such other and further relief deemed just and proper.

Dated: September 1, 2023                    Respectfully submitted,

KALMANSON COHEN, PLLC          LEWIS JOHS AVALLONE AVILES, LLP
Kimberly Kalmanson
Randi M. Cohen
One Liberty Plaza                 By:    /s/ Michael J. Del Piano
165 Broadway, 23rd Floor                 Michael J. Del Piano
New York, New York 10006              Dennis C. Valet
(646) 759-3655                     Teresa L. Staiano
kim@kalmansoncohen.com             1377 Motor Parkway, Suite 400
randi@kalmansoncohen.com            Islandia, New York 11749
                                       (631) 755-0101
                                       mjdelpiano@lewisjohs.com
                                       dcvalet@lewisjohs.com
                                       tlstaino@lewisjohs.com

                                       *Attorneys for Plaintiffs*