UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CELINE LOH XIAO HAN, VANNESSA
CHAO WAN YI, SUPPHATTRA
SONBANKOH, DUANGRETHAI
SAENSOM, JHOAM FELIPE TOLEDO
VILLAMIZAR, LIZETTHE NATALIA
TORRES JAIMES, SAMANTHA
CAROLINA MOLINA ESPINOZA, and
VICTOR JOSHUE ROCAFUERTE ALAY,

                  Plaintiffs,

        -against-

INTEREXCHANGE, INC., EIFFEL
REDDINGS, LLC, MARIE EIFFEL, LLC,
REDDINGS MARKET, LLC, and MARIE
EIFFEL,

              Defendants.

Case No. 1:23-cv-07786 (JLR)

**<u>OPINION AND ORDER</u>**

---

JENNIFER L. ROCHON, United States District Judge:

Plaintiffs – Celine Loh Xiao Han, Vannessa Chao Wan Yi, Supphattra Sonbankoh,

Duangruethai Saensom, Jhoam Felipe Toledo Villamizar, Lizetthe Natalia Torres Jaimes,

Samantha Carolina Molina Espinoza, and Victor Joshue Rocafuerte Alay – are foreign nationals

who were staffed through a government-backed work-travel program at Marie Eiffel Market (the

"Market") in Shelter Island, New York.[1]  There, under the Market's eponymous owner, Plaintiffs

---

[1] The names of several Plaintiffs are spelled inconsistently throughout the parties' pleadings and
motion papers.  *Compare, e.g.*, Dkt. 13 (the "Complaint" or "Compl.") at 1 (caption referring to
"Duangrethai Saesom" (further capitalization omitted)), *with id.* ¶ 13 ("Duangruethai Saensom");
*compare id.* ¶ 11 ("Vannessa Chao Wan Yi"), *with* Dkt. 48 at 34-40 ("Crosscl.") ¶ 21 ("Vanessa
Wan Yi Chao"), *and* Dkt. 31-3 at 1 ("Vanessa Chao Wan Yi"); *compare* Compl. ¶ 14 ("Lizetthe
Natalia Torres Jaimes"), *with* Crosscl. ¶ 23 ("Lizetthe Natalia Torres Jaime").  For the purposes
of this motion, the Court will refer to these Plaintiffs as Duangruethai Saensom, Vannessa Chao
Wan Yi, and Lizetthe Natalia Torres Jaimes.  Should the parties wish to correct the spelling of
certain Plaintiffs' names in the case caption, they may file a request to do so.

claim they suffered an intolerable workplace rife with sexual assault, battery, discrimination, harassment, and wage theft.  They bring this action against Marie Eiffel, Eiffel Reddings, LLC, Marie Eiffel, LLC, and Reddings Market, LLC (together, the "Eiffel Defendants) and the company that sponsored their visas, InterExchange, Inc. ("InterExchange" and, together with the Eiffel Defendants, "Defendants").

Plaintiffs assert claims under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1589 *et seq.* (the "TVPRA"); the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"); the New York Labor Law (the "NYLL"), N.Y. Lab. Law § 1 *et seq.*, and applicable regulations; the New York General Business Law, N.Y. Gen. Bus. Law §§ 349-350; and common law.  *See* Compl. ¶¶ 170-327.  In addition, InterExchange filed crossclaims for indemnification and breach of contract against the Eiffel Defendants, seeking damages for, among other things, attorney's fees incurred in connection with Plaintiffs' claims. Crosscl. ¶¶ 25-41.

The Eiffel Defendants have moved to dismiss Plaintiffs' claims against them.  Dkt. 31-3 ("Br.").  Plaintiffs oppose the motion.  Dkt. 34 ("Opp."); *see also* Dkt. 36 ("Reply").  The Eiffel Defendants have also moved to dismiss InterExchange's crossclaims.  Dkt. 50-4 ("Crossclaim Br.").  InterExchange opposes that motion, Dkt. 54 ("Crosscl. Opp."); *see also* Dkt. 55 ("Crosscl. Reply"), but did not move to dismiss Plaintiffs' claims, *cf.* Dkt. 48.  For the following reasons, the Eiffel Defendants' motion to dismiss the complaint is granted in part and denied in part; their motion to dismiss InterExchange's crossclaims is denied.

## BACKGROUND

### I.    Factual Background

Unless otherwise stated, the following facts are taken from both the Complaint and

InterExchange's Answer and Crossclaims and assumed true for purposes of these motions.  *See*

*New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 168 (2d

Cir. 2023).

### A.  Plaintiffs' Onboarding Process

#### 1.  *The Exchange Visitor Program*

Congress created the Exchange Visitor Program through the Mutual Educational and

Cultural Exchange Act of 1961, 22 U.S.C. § 2451 *et seq.*, to encourage diplomacy and foster

cultural exchange with other countries.  Compl. ¶ 34.  The U.S. Department of State administers

the program by designating sponsor entities.  *Id.* ¶¶ 35, 37.  Sponsors select "Exchange Visitors,"

also known as "J-1 workers," who are foreign nationals looking to enter or who have entered the

United States on a non-immigrant J-1 visa or who have obtained J status in the United States.  *Id.*

¶ 36.

Of the fourteen programs in which Exchange Visitors can participate, the Summer Work

Travel program is the largest.  *Id.* ¶ 38.  The purpose of this program is to provide foreign

students "with opportunities to interact with U.S. citizens, experience U.S. culture while sharing

their own cultures with Americans they meet, travel in the United States, and work in jobs that

require minimal training and are seasonal or temporary in order to earn funds to help defray a

portion of their expenses."  *Id.* ¶ 39 (quoting 22 C.F.R. § 62.32(b)).

#### 2.  *InterExchange's Program Sponsorship*

Since 1970, InterExchange has been a designated sponsor for the Summer Work Travel

Program.  *Id.* ¶ 41.  The company works with organizations in over 60 countries to recruit and

screen applicants for employers in the United States.  *Id.* ¶ 42.  As a sponsor, InterExchange is

responsible for selecting J-1 workers; providing information on their rights; vetting potential host

employers; placing J-1 workers with host employers "suitable for the J-1 worker's needs"; and monitoring workers throughout their stay.  *Id.* ¶ 43 (citing 22 C.F.R. §§ 62.10, 62.32).

### 3. *Eiffel's Host Employer Agreements*

Through a series of limited-liability companies, Marie Eiffel owns and operates the Market, as well as a fashion boutique.  *See id.* ¶¶ 11, 21-30.  On January 13 and October 16, 2021, Eiffel entered into several agreements with InterExchange in connection with the Eiffel Defendants' application to participate as a host employer for the spring of 2021, the spring of 2022, and the summer of 2022.  Crosscl. ¶¶ 6-8; *see* Dkt. 50-5 (the "Agreements").[2]

Under the Agreements, InterExchange identified the Market as a Program Host that could, subject to certain terms and conditions, employ participants in InterExchange's Summer Work Travel program.  Crosscl. ¶ 9.  The Agreements each contained several provisions relevant here.  One provision stated that, "[d]uring the Program, the Host shall not engage in any illegal activities or activities that may bring the Program or InterExchange into notoriety or disrepute."  *Id.* ¶ 10.  Another stated:

> All Participants are at-will employees of the Host and may choose at any time to leave a Host's employment without recourse by the Host.  All decisions regarding the Participant's Program status or dismissal from the Program shall be made at the sole discretion of InterExchange and shall be final.  The Host may not represent to Participants that the Host has any authority over or influence on the Participants' Visa status.  Nothing contained in this Agreement shall in any way be construed to give rise to a joint employment, partnership, joint venture, or agency relationship between InterExchange and the Host.

---

[2] Although InterExchange did not attach the Agreements to its pleading asserting crossclaims, the agreements are incorporated by reference and integral to its crossclaims.  *See Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (noting that, on motions to dismiss, courts "may review . . . documents appended to the complaint or incorporated in the complaint by reference . . . as well as documents not expressly incorporated by reference in the complaint that are nevertheless 'integral' to the complaint" (brackets, quotation marks, and citation omitted)).

*Id.* ¶ 11 (brackets omitted).  The Agreements further added that "Participants are not employees of InterExchange and InterExchange does not exercise control over the actions of Participants." *Id.* ¶ 12.

Significantly, the Agreements also contained a "Limitation on Liability" clause stating that:

> The Participants are not entitled to receive, and have no right nor eligibility to wages, benefits, or other fringe benefits from InterExchange.  To the extent permitted by law, the Host shall hold harmless, indemnify and/or defend InterExchange from losses, liabilities or expenses incurred in connection with claims made or brought against the Host in connection with the Host's employment of the Participants, including but not limited to:
>
> (i)     Any workers' compensation claim or lawsuit arising from a work-related injury sustained by a Participant;
>
> (ii)    Any claim or lawsuit by a Participant arising from an alleged violation of any law governing the wages and working conditions of the Participant;
>
> (iii)   Any claim or lawsuit by a participant for wrongful termination, discrimination, harassment or retaliation of a Participant by the Host or any employee of the Host.

*Id.* ¶ 13; *see* Agreements at 5, 12.

InterExchange alleges that, in reliance on these representations, it entered into the Agreements with the Eiffel Defendants and agreed to act as Plaintiffs' J-1 visa sponsor in connection with Plaintiffs' participation in the program and employment at the Market.  Crosscl. ¶¶ 14-24.

### 4.  *Plaintiffs' Recruitment*

Plaintiffs – then living in Malaysia, Thailand, Colombia, and Ecuador – were all recruited to participate in InterExchange's Summer Work Travel program.  *See* Compl. ¶¶ 49-50, 52, 55, 58, 61.  To participate in the program, Plaintiffs paid several fees and costs to InterExchange,

including a registration fee, program sponsor fee, visa fee, Student and Exchange Visitor Information System fee, and an interview fee.  *See id.* ¶¶ 52-63.  They also paid their own travel costs to get to the United States.  *Id.* ¶ 64.  To cover these costs, each Plaintiff "borrowed money, in some instances thousands of dollars, from their parents."  *Id.* ¶ 51.

InterExchange matched Plaintiffs with the Market.  *Id.* ¶ 66.  Before starting work, each Plaintiff signed an InterExchange "Job Offer," which stated that Plaintiffs would work at least 65 hours per week at the Market and that overtime laws applied.  *Id.* ¶¶ 67-68.  InterExchange also provided Plaintiffs with the Wilberforce Pamphlet on the Rights and Protections for Temporary Workers.  *Id.* ¶ 69; *see* Dkt. 13-1.

Eiffel required each Plaintiff to sign a "New Employee Handbook" before starting work.  Compl. ¶ 70; *see* Dkt. 13-2 (the "Handbook").  The document stated that Plaintiffs' "tips will be calculated at the end of each month and PAID OUT AT THE END OF YOUR CONTRACT."  Handbook at 3; *see id.* ("YOU MUST COMPLETE YOUR FULL CONTRACT in order to receive the tip payments.").  The Handbook also required Plaintiffs to sign a confidentiality and non-compete agreements.  *Id.*

## B.  Plaintiffs' Employment

Plaintiffs worked at the Market at different times within the same two-year period.  Duangruethai Saensom ("Ai"), from Thailand, worked at the Market from May 2021 until September 11, 2021.  Compl. ¶¶ 13, 121.  Samantha Carolina Molina Espinoza ("Samantha") and Victor Joshue Rocafuerte Alay ("Victor"), both from Ecuador, worked at the Market from February 2022 until May 2022 and at least September 2022, respectively.  *Id.* ¶¶ 16-17, 79, 149.  Celine Loh Xiao Han ("Celine") and Vannessa Chao Wan Yi ("Vannessa"), both from Malaysia, Jhoam Felipe Toledo Villamizar ("Felipe") and Lizethe Natalia Torres Jaimes ("Natalia"), both

from Colombia, and Supphattra Sonbankoh ("Lew"), from Thailand, all worked at the Market from May to September 2022. *Id.* ¶¶ 10-12, 14-15, 83, 92, 102, 108, 117.

"Almost immediately following Plaintiffs' beginning of employment, Marie [Eiffel] engaged in rampant physical and sexual assault and discrimination toward them, threatened their employment, and illegally withheld wages and tips." *Id.* ¶ 74. Below, the Court recounts Plaintiffs' allegations of mistreatment.

### 1.  *Allegations of Physical and Sexual Assault*

At the Market, Eiffel spanked, groped, kissed, and choked her employees. *Id.* ¶¶ 76-77. She acted as though this behavior was funny. *Id.* ¶ 78; *see id.* ¶¶ 104, 116, 139. On at least one occasion, Eiffel had an employee record her spanking another employee with a bunch of parsley while she laughed at the camera. *Id.* ¶ 78.

Eiffel spanked most of the Plaintiffs in multiple settings, including while alone, in front of other employees, and in front of customers. *See id.* ¶¶ 80, 84, 93, 103, 109, 118, 122. She spanked Ai on the buttocks over half a dozen times while she worked at the Market. *Id.* ¶¶ 122-123. Eiffel also put her hands on Ai's face, "aggressively sh[ook] her head," and pulled Ai's hair while Ai was working in the kitchen. *Id.* ¶¶ 124-125.

Eiffel spanked Samantha on the buttocks over 20 times. *Id.* ¶¶ 80-81. Eiffel kissed Samantha often, sometimes "coming up from behind while Samantha was working so that Samantha could not stop Marie from kissing her." *Id.* ¶ 82.

Eiffel spanked Celine on the buttocks over 30 times. *Id.* ¶¶ 85-86. One day, on September 3, 2022, she spanked Celine three times in front of customers. *Id.* ¶ 86. Celine also saw Eiffel spank other employees' buttocks "on many occasions, including Lew, Vannessa, and an employee named Danica." *Id.* ¶ 87. Eiffel groped Celine's breasts on multiple occasions, including on September 7, 2022, when she approached Celine in the kitchen and "groped her

body, including her breasts." *Id.* ¶¶ 88-89.  On another occasion, Eiffel "wrapped her hands around Celine's neck" and choked her, then laughed and walked away. *Id.* ¶ 91 (incident happened on July 7, 2022).

Eiffel spanked Vannessa on the buttocks over 30 times. *Id.* ¶¶ 93, 96.  On August 19, 2022, while talking to a customer, Eiffel "slid her finger down Vannessa's pants between the cheeks of her buttocks and touched her anus." *Id.* ¶ 94.  Vannessa also saw Eiffel spank other employees, including Lew, Celine, and Danica on many other occasions. *Id.* ¶ 97.  Eiffel groped Vannessa's breasts in front of other employees, including on September 4, 2022, when she came up from behind Vannessa in the kitchen and groped her breasts while Vannessa was cutting vegetables. *Id.* ¶¶ 98-99.  When Vannessa told Eiffel to stop, Eiffel laughed at Vannessa and imitated her in a sarcastic tone. *Id.* ¶ 99.  On another occasion, Vannessa requested commissions for selling nearly $5,000 in merchandise at Eiffel's fashion boutique. *Id.* ¶¶ 100-101.  Eiffel "angrily responded that Vannessa had not performed well enough to prove that she deserved a commission and then suddenly wrapped her hands around Vannessa's neck" and choked her, stating that Vannessa was "driving her [] crazy." *Id.* ¶ 101.

Eiffel spanked Lew on the buttocks over 30 times, including twice on August 17, 2022, while Lew was working in the kitchen. *Id.* ¶¶ 103-104, 106.  On August 19, 2022, Eiffel "suddenly slapped Lew on the buttocks very hard, while [a] customer was watching," then slapped her "again on the buttocks three more times, harder each time." *Id.* ¶ 105.  Lew saw Eiffel spank other employees, including Celine, Vannessa, and Danica. *Id.* ¶ 107.

Eiffel spanked Natalia on the buttocks over half a dozen times, including while she was preparing products for sale or cutting vegetables. *Id.* ¶¶ 109-111.  Natalia saw Eiffel spank other employees "on many occasions, including Felipe and other cashiers." *Id.* ¶ 112.  On June 26,

2022, Eiffel "grabbed Natalia by the arm and dragged her into the kitchen so roughly that it left bruises on her arm." *Id.* ¶ 114.  Eiffel "grabbed Natalia in a similar manner more than 10 times." *Id.* ¶ 115; *see id.* ¶ 113.  On another occasion, Eiffel rubbed chocolate mousse cream in Natalia's face, then laughed at her.  *Id.* ¶ 116.

Eiffel spanked Felipe on the buttocks over 15 times.  *Id.* ¶¶ 118-119.  Felipe also saw Eiffel spank other employees "on many occasions, including Natalia."  *Id.* ¶ 120.

### 2.  *Allegations of Verbal Harassment*

Eiffel called her employees "spoiled brats," referred to them as "stupid," said they were "useless," and routinely threatened to fire any employee who tried to speak out against her conduct.  *Id.* ¶¶ 135-136.

Within weeks of Ai's start at the Market in 2021, Eiffel began to make fun of Ai's eyes, calling them "narrow" and pulling her own eyes to make herself "appear" Asian.  *Id.* ¶ 126. Eiffel also once yelled at Ai in front of other employees for greeting Eiffel in Spanish.  *Id.* ¶ 145. She forbade Ai from speaking Spanish and told another employee not to "teach Ai Spanish, because no one wants to speak Spanish and no one wants to be born Spanish."  *Id.* ¶ 145 (brackets omitted).

Eiffel routinely referred to Celine, Vannessa, and Lew as the "Asian Girls" and told them that white people do not welcome Asian people, "just like the blacks."  *Id.* ¶¶ 127, 132.  Eiffel also told them that "Asians have a yellow face and are expressionless, just like wearing a mask and you can never understand what they are thinking because they just look at you."  *Id.* ¶ 133. When Alyssa, the Market's manager, told Eiffel that she was being rude, Eiffel responded, "But it is true!"  *Id.*  Eiffel also said that Celine, Vannessa, and Lew needed to experience "pain" to be better at their jobs.  *Id.* ¶ 134.  Eiffel told Celine and Lew, in front of other employees, that they "did not have the brain" to solve a customer's request.  *Id.* ¶ 128.  She also told Celine that she

had a "fake smile" and was not "as bubbly and expressive as Americans." *Id.* ¶ 129.  Eiffel told

Lew that her face was "uninteresting" and that she looked like an old lady. *Id.* ¶¶ 130-131.

On June 18, 2022, Vannessa was working in Eiffel's fashion boutique when Eiffel began

screaming that Vannessa was boring. *Id.* ¶ 137.  Eiffel said that Vannessa needed "to have fun,

go drink some wine[,] and smoke [a] joint," and to "have sex in the dressing room." *Id.* ¶ 138.

She told Vannessa that Vannessa's boyfriend would leave her if she was "this boring" because

"[m]en only like women who will have fun." *Id.*  Eiffel laughed as she said this before leaving

the store. *Id.* ¶ 139.  In July 2022, upon hearing of Lew's plans to visit New York City with her

male housemate, Eiffel told Lew to "go fuck [the housemate] in New York" in front of other

employees. *Id.* ¶ 140.

On another occasion, Eiffel asked her J-1 workers to "make a homemade dish reflective

of their culture" so that Eiffel could find new recipes for the Market. *Id.* ¶ 141.  When Eiffel

tried Vannessa's Korean chicken and rice, she responded, "[W]at the fuck is this?  It tastes

disgusting," and told Vannessa to "go, get the fuck out of my kitchen!" *Id.* ¶ 142.  Eiffel then

approached Vannessa, "put[] her face right up to Van[n]essa's," and threatened to fire her if she

ever came into the kitchen uninvited. *Id.*  Eiffel later asked Vannessa for the recipe. *Id.*

On August 13, 2022, Vannessa was working at Eiffel's boutique while wearing one of the

store's dresses at the manager's request. *Id.* ¶ 143.  Eiffel told Vannessa that she "looked

terrible" in the dress because it was designed to be worn by tall women with blonde hair. *Id.*

### 3.  *Wage-Related Allegations*

"For virtually all of Plaintiffs' workdays . . . , Defendants required Plaintiffs to work"

shifts exceeding 10 hours a day but failed to pay them spread-of-hours pay in the form of an

additional hour's pay. *Id.* ¶ 148.  For 84 of the 89 days that they worked between May and

September 2022, Celine and Vannessa each worked "in excess of 10 hours." *Id.* ¶ 149.  For 102

of the 109 days that she worked between April and September 2022, Natalia worked for over 10 hours. *Id.* For 104 of the 111 days that he worked during the same period, Victor worked for over 10 hours. *Id.* The other Plaintiffs – Ai, Lew, Samantha, and Felipe – "similarly worked in excess of 10 hours almost every day they worked at the Market." *Id.* ¶ 150; *see id.* ¶ 148.

Plaintiffs did not receive any tips until they completed their work programs. *Id.* ¶ 154. Moreover, Eiffel and her managers threatened on several occasions to keep Plaintiffs' tips if they did not believe that each respective Plaintiff had worked hard enough. *Id.* ¶ 155. On other occasions, they indicated that they would keep some of Plaintiffs' tips. For example, on June 7, 2022, Alyssa, the Market's manager, told Celine and Lew that they would receive only three percent of the store's debit tips – as opposed to 10 percent for other employees – because Eiffel did not like how they handled customers. *Id.* ¶ 156. The same day, Jason, another manager and Eiffel's boyfriend, told Vannessa that she, Celine, and Lew would receive lower tips than their co-workers. *Id.* ¶¶ 155, 157.

Eiffel also kept tips for herself and refused to provide Plaintiffs with an accurate calculation of the tips that the Market received. *See id.* ¶¶ 158-159 (cash, credit-card, and debit-card tips). On at least one occasion in the summer of 2022, Eiffel told employees she "lost" the cash tips earned that day. *Id.* ¶ 160. On other occasions, she threatened to withhold employees' cash tips if they asked her about the tips received. *Id.* ¶ 161. She threatened to fire any employee who asked about tips, "including the amount of tips received on a given day or the total amount of tips that each employee was entitled to receive." *Id.*

### 4. Complaints to InterExchange

Each Plaintiff complained to InterExchange about Eiffel's treatment. *Id.* ¶¶ 163. For example, Celine and Vannessa notified InterExchange of their issues with Eiffel and requested a different placement because of Eiffel's treatment. *Id.* ¶ 165. In response, InterExchange

provided placement options that were about an hour and a half from Shelter Island, where Celine and Vannessa were living, "without providing any option for transportation to and from the assignments." *Id.* ¶ 166. When other Plaintiffs complained, InterExchange either ignored the complaints or provided "unworkable and unreasonable solutions." *Id.* ¶ 168. InterExchange continues to place J-1 workers at the Market under Eiffel's supervision. *Id.* ¶ 169.

## II.    Procedural History

On September 1, 2023, Plaintiffs filed suit. Dkt. 1; *see* Compl. (refiled four days later due to docketing issue). Plaintiffs assert various causes of actions, including claims against all Defendants for violations of the TVPRA; claims against all Defendants for discrimination and harassment under the NYSHRL; claims against InterExchange for discrimination and harassment under the NYCHRL; claims against InterExchange for aiding and abetting violations of the NYSHRL and NYCHRL; claims against all Defendants for spread-of-hours pay and the theft of tips under the NYLL; claims against InterExchange for unlawful deceptive acts and practices and false advertising under the GBL; claims against InterExchange for negligent misrepresentation and breach of fiduciary duty; and claims against the Eiffel Defendants (excluding Eiffel herself) for negligent hiring, retention, and supervision. Compl. ¶¶ 170-322. Celine, Vannessa, Felipe, Lew, and Natalia also bring claims against Eiffel for battery. *Id.* ¶¶ 323-327.

On September 29, 2023, the Eiffel Defendants moved to dismiss the Complaint. Br. The motion was fully briefed as of October 20, 2023. Opp.; Reply. On December 28, 2023, InterExchange answered the Complaint and filed crossclaims for indemnification and breach of contract against the Eiffel Defendants. Crosscl. The Eiffel Defendants moved to dismiss InterExchange's crossclaims on January 18, 2024. Crosscl. Br. The motion was fully briefed as of February 16, 2024. *See* Crosscl. Opp.; Crosscl. Reply.

### III.    Applicable Legal Standard

Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court draws all reasonable inferences in the plaintiff's favor and accepts as true all non-conclusory allegations of fact.  *Id.*  However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability."  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

In considering a motion to dismiss under Rule 12(b)(6), "district courts 'may review only a narrow universe of materials,' which includes 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, matters of which judicial notice may be taken,' as well as 'documents not expressly incorporated by reference in the complaint that are nevertheless "integral" to the complaint.'"  *Clark*, 89 F.4th at 93 (brackets and ellipsis omitted) (quoting *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)).  "Where a document is referenced in a complaint, the documents control and this Court need not accept as true the allegations in the . . . complaint."  *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quotation marks and citation omitted).

### DISCUSSION

The Eiffel Defendants filed two motions to dismiss: one to dismiss Plaintiffs' claims against them, and another to dismiss InterExchange's crossclaims.  The Court takes each motion

in turn.

### I. Plaintiffs' Claims

The Eiffel Defendants argue that the eight Plaintiffs are misjoined in a single action and that Plaintiffs have engaged in improper group pleading. *See* Br. at 1. They also argue that each Plaintiff, on their own, fails to state most of the federal and state-law claims alleged. *See id.* at 1-3. The Court first considers the Eiffel Defendants' procedural objections, then addresses Plaintiffs' claims on their merits.

### A. Procedural Objections

#### 1. Joinder

The Eiffel Defendants first argue that the eight Plaintiffs have "lump[ed]" themselves together "in a single action against multiple Defendants." Br. at 1. Plaintiffs' "[m]isjoinder," they contend, "require[s] dismissing the Complaint." *Id.* at 11.

The Court disagrees. "Misjoinder of parties is not a ground for dismissing an action." Fed. R. Civ. P. 21. That said, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." *Id.* Although the Court rejects the Eiffel Defendants' invitation to dismiss the action wholesale on misjoinder grounds, it will consider whether each Plaintiff is properly joined in this case. *See Agnesini v. Dr.'s Assocs., Inc.*, 275 F.R.D. 456, 458 (S.D.N.Y. 2011) (noting courts' "broad discretion to sever parties or claims from the action" (ellipsis and citation omitted)).

Under Rule 20(a)(1), "[p]ersons may join in one action as plaintiffs if: (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." "Both criteria must be met for joinder to be proper under the plain language of Rule 20." *Ardolf v. Weber*, 332 F.R.D. 467, 479 (S.D.N.Y.

2019) (brackets, quotation marks, and citation omitted). "Other relevant considerations include '(1) whether severance would serve judicial economy; (2) whether prejudice to the parties would be caused by severance; and (3) whether the claims involve different witnesses and evidence.'" *Agnesini*, 275 F.R.D. at 458 (quoting *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008)).

The Federal Rules of Civil Procedure permit "the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties[,] and remedies is strongly encouraged." *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966); *see N. Jersey Media Grp. Inc. v. Fox News Network, LLC*, 312 F.R.D. 111, 114 (S.D.N.Y. 2015) ("[S]everance should generally be granted only in exceptional circumstances." (quotation marks and citation omitted)). "Although the requirements of [Rule] 20(a) are to be interpreted liberally to enable the court to promote judicial economy by permitting all reasonably related claims for relief by or against different parties to be tried in a single proceeding, the requirements of the rule still must be met and constrain the Court's discretion." *Kalie v. Bank of Am. Corp.*, 297 F.R.D. 552, 557 (S.D.N.Y. 2013) (further brackets, quotation marks, and citation omitted).

For the reasons stated below, the Court declines to sever Plaintiffs from this action.

     a.  Same Transaction or Occurrence

"There is no rigid rule as to what constitutes the same series of transactions or occurrences for purposes of joinder under Rule 20." *Agnesini*, 275 F.R.D. at 458 (citation omitted). To construe the meaning of "transaction or occurrence" in Rule 20, "many courts have drawn guidance from the use of the same term in Rule 13(a), applying to compulsory counterclaims." *Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 228 (E.D.N.Y. 2013) (citation omitted) (collecting cases); *accord Bautista v. Banks*, No. 23-cv-07366 (GHW), 2023 WL 6811775, at *2 (S.D.N.Y. Oct. 16, 2023); *Hunley v. BuzzFeed, Inc.*, No. 20-

cv-08844 (ALC), 2021 WL 4482101, at *4 (S.D.N.Y. Sept. 30, 2021). In the Rule 13(a) context, the Second Circuit applies the "logical relationship" test. *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004) (citation omitted). "That is, courts are to look to the logical relationship between the claims and determine 'whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" *Kalie*, 297 F.R.D. at 557 (quoting *United States v. Aquavella,* 615 F.2d 12, 22 (2d Cir. 1979)); *accord Ardolf*, 332 F.R.D. at 480; *see Jones*, 358 F.3d at 209 (noting that "the 'logical relationship' test does not require 'an absolute identity of factual backgrounds'" (quoting *Aquavella*, 615 F.2d at 22)).

A "logical relationship" exists between each set of claims in this case. Plaintiffs were recruited by InterExchange through the same Summer Work Travel program, worked at the Market for the same employer, and experienced similar instances of mistreatment by that employer during the same two-year period. *See generally* Compl. Eiffel required every Plaintiff to sign a Handbook stating that workers would not receive tips until completing their "Job Offer" contracts. *Id.* ¶ 70. Also, Eiffel routinely spanked seven of the eight Plaintiffs. *Id.* ¶¶ 76, 80, 84, 93, 103, 109, 118, 122. At some point in May 2022, seven of the eight Plaintiffs may have all worked at the Market. *See id.* ¶¶ 10-11, 14-17, 79, 83, 92, 102, 108, 117. These allegations are enough to establish at least a "logical relationship" between the Plaintiffs' TVPRA claims. *See Ardolf*, 332 F.R.D. at 480 (plaintiffs' claims under the Trafficking Victims Protection Act (the "TVPA"), which the TVPRA reauthorized, arose from the same series of transactions and occurrences where the defendant "subjected them to the same *modus operandi* to molest them," which was "the common thread that logically tie[d] all Plaintiffs' claims" (footnote omitted)). Plaintiffs' NYSHRL claims against the Eiffel Defendants are similarly grounded in the same

conduct by the same employer. *See Lewis v. Triborough Bridge & Tunnel Auth.*, No. 97-cv-00607 (PKL), 2000 WL 423517, at *5 (S.D.N.Y. Apr. 19, 2000) (claims sufficiently similar to justify joinder, "[d]espite factual differences," where plaintiffs alleged "a similar pattern of sexual harassment that was exacerbated by their supervisor's continued indifference to their situation"); *Blesedell v. Mobil Oil Co.*, 708 F. Supp. 1408, 1422 (S.D.N.Y. 1989) (first Rule 20(a)(1) requirement met where plaintiffs all alleged sexually discriminatory actions by their supervisor during a common period). So too are Plaintiffs' NYLL wage-and-hour claims. *See Viada v. Osaka Health Spa, Inc.*, 235 F.R.D. 55, 61 (S.D.N.Y. 2006) (logical relationship between claims where "plaintiffs are seeking relief arising out of . . . the alleged repeated failure by their employer . . . to compensate them for the hours they worked in accordance with applicable laws").

The Eiffel Defendants argue that Plaintiffs' claims do not arise out of the same transaction or occurrence because they stem from "8 different employment contracts and separate events that occurred at different times." Br. at 5. Yet the logical-relationship test does not demand "an absolute identity of factual backgrounds." *Jones*, 358 F.3d at 209 (citation omitted). The issue is instead whether "the essential facts" of Plaintiffs' claims "are so logically connected" as to warrant one lawsuit. *Ardolf*, 332 F.R.D. at 479 (emphasis and citation omitted). That is true here: Plaintiffs are all foreign nationals who InterExchange placed at the Market at roughly the same time, and Eiffel required them to sign the same documents, issued the same threats to them, and subjected most of them to the same methods of physical mistreatment. That some Plaintiffs have more detailed allegations than others may bear on whether certain Plaintiffs

have failed to state a particular claim; it does not bar them from staying in the same action before the Court. Therefore, the first Rule 20(a)(1) factor favors joinder.[3]

  b.  Common Questions of Law or Fact

Rule 20(a)(1)'s "second requirement is satisfied if the court finds that there is 'substantial' overlap in questions of law or fact across the claims." *Id.* "There is no requirement, however, that all questions of law and fact be *identical* . . . . Indeed, the Rule provides for joinder as long as there is *any* question of fact common to all." *Id.* at 481 (quoting *Kehr*, 596 F. Supp. 2d at 827); *accord Blesedell*, 708 F. Supp. at 1422.

In this action, Plaintiffs share much more than one common question of law or fact. As discussed below, at least one common question of law for Plaintiffs' TVPRA claims is whether Eiffel's withholding of tips – under, for example, the Handbook that every Plaintiff signed – amounted to serious harm or a threat of serious harm. *Cf. Ardolf*, 332 F.R.D. at 480 ("[A]t issue for all Plaintiffs is at least one common question of law: whether Defendant's *modus operandi* of fondling Plaintiffs' genitals during private photoshoots constitutes sex trafficking."). Also common to Plaintiffs' NYLL claims is whether Plaintiffs worked more than 10 hours per day, for which they were entitled to spread-of-hours pay. *See Viada*, 235 F.R.D. at 61-62 (finding common questions of law and fact for Plaintiffs' wage-and-hour claims, including "whether the defendants . . . were the plaintiffs' employer and . . . determined the rate and method of any compensation the plaintiffs received for the work they performed"). A common question of law

---

[3] The Eiffel Defendants' assertion in their reply brief that "[a]bsent a class [action], courts find misjoinder" mischaracterizes the case cited for that point. Reply at 8 (citing *Blake v. Bronx Leb. Hosp. Ctr.*, No. 02-cv-03827 (CBM), 2003 WL 21910867, at *5 (S.D.N.Y. Aug. 11, 2003)). *Blake* expressed doubt that a plaintiff could bring a "pattern and practice" claim in a non-class action complaint but did not mention misjoinder. 2003 WL 21910867, at *5.

further exists as to whether InterExchange owed all Plaintiffs a duty to monitor the Market and ensure that Plaintiffs' work placement there was suitable for their needs.

The Eiffel Defendants do not dispute that Plaintiffs share a common question of law, instead arguing that the Complaint "alleges facts unique to each Plaintiff's employment." Br. at 5. That "a trier of fact will . . . have to make factual determinations unique to each individual Plaintiff," however, is no obstacle to joinder where the plaintiffs share at least one common question of law or fact. *Ardolf*, 332 F.R.D. at 481; *see Blesedell*, 708 F. Supp. at 1422 ("[T]he fact that individual plaintiffs may have suffered different effects from the alleged discrimination is immaterial for the purposes of determining the common question of law or fact."). Therefore, the second Rule 20(a)(1) factor favors joinder.

### c. Supplemental Factors

The other relevant factors of judicial economy, prejudice to the parties, and overlapping evidence also favor joinder in this case. *See Agnesini*, 275 F.R.D. at 458. First, severance would not serve judicial economy. To the contrary, it "would surely be a waste of judicial resources" at every stage of this litigation to sever Plaintiffs' claims. *Kehr*, 596 F. Supp. 2d at 828. In *Ardolf*, the defendant claimed that conducting one trial with five plaintiffs "would result in a lengthier trial, fraught with confusing instructions to the jury, endless curative instructions from the Court, and time spent wasted on complex legal issues related to each individual Plaintiff." 332 F.R.D. at 481 (quotation marks and ellipsis omitted). The court disagreed, stating that five different trials, "with overlapping evidence and testimony[,] could be equally wasteful, if not worse." *Id.* Here, the Plaintiffs offer similar accounts of mistreatment under Eiffel. Many of them also witnessed Eiffel mistreat other Plaintiffs and co-workers. *See* Compl. ¶¶ 87, 97, 107, 112, 120. Separating the Plaintiffs into eight different cases, each with largely the same evidence and testimony, would waste everyone's time and resources.

Second, the parties risk little prejudice from trying all of Plaintiffs' claims in the same case. The Eiffel Defendants claim prejudice from the fact that they would have to defend "against eight claims having disparate facts." Reply at 8. But "jurors are perfectly capable of separating fact patterns that pertain to each individual Plaintiff, while understanding that they may have certain elements in common." *Ardolf*, 332 F.R.D. at 481-82; *see Kehr*, 596 F. Supp. 2d at 823 ("I am unconvinced that jurors will be unable to separate the different fact patterns presented by the [individual plaintiffs'] claims during trial or that trying the claims together will result in prejudice to either party."). The "inefficiencies to all the parties that would result if [separate] trials were held would outweigh any convenience gained by extracting" Plaintiffs' claims against Defendants. *Lewis*, 2000 WL 423517, at *4 (quotation marks and citation omitted). Save for the number of plaintiffs, the Eiffel Defendants identify nothing else about this case that warrants severance.

Third, the overlapping witnesses and evidence in this case strongly weigh in favor of joinder. "While nearly every trial involving multiple defendants will involve some separate issues of fact that call for testimony from different witnesses on entirely unrelated matters, the more appropriate question is whether separate trials will require substantial overlap of witnesses or documentary proof." *N. Jersey Media Grp.*, 312 F.R.D. at 117 (brackets, quotation marks, ellipsis, and citation omitted). Several Plaintiffs – Celine, Vannessa, Felipe, Natalia, and Lew – saw Eiffel mistreat their co-workers, including other Plaintiffs. *See* Compl. ¶¶ 87, 97, 107, 112, 120. Were the Court to split this case, many Plaintiffs would need to testify separately in each other's cases. The documentary proof also overlaps; each Plaintiff signed the same documents to work for the same employer under the same terms. *See id.* ¶¶ 67, 70. Conducting eight trials with overlapping evidence and testimony would be more wasteful than one trial with all eight

Plaintiffs.  *See Ardolf*, 332 F.R.D. at 482 ("Should this Court sever Plaintiffs' claims,

[overlapping] witnesses will have to be deposed and possibly called as witnesses at trial for each

individual Plaintiff's case, needlessly quintuplicating the efforts of the parties, counsel, and this

Court.").

For all these reasons, the Court declines to sever any of the Plaintiffs or their claims from

this case.

### 2. Notice Pleading

The Eiffel Defendants also argue that "Plaintiffs have . . . engaged in group pleading by

lumping together Plaintiffs and Defendants."  Br. at 6.  Whether Plaintiffs have lumped their

claims together is a question of joinder, already discussed above.  *See* Fed. R. Civ. P. 20(a)(1).

Whether Plaintiffs have "lump[ed] all the *defendants* together in each claim and provid[ed] no

factual basis to distinguish their conduct" is a group-pleading issue under Rule 8.  *Atuahene v.*

*City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order) (emphasis added); *see*

*Plusgrade L.P. v. Endava Inc.*, No. 21-cv-01530 (MKV), 2023 WL 2402879, at *3 (S.D.N.Y.

Mar. 8, 2023) ("Such a deficient pleading is called improper 'group pleading.'").

Under Rule 8, a pleading must contain "a short and plain statement of the claim showing

that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "Each allegation must be simple,

concise, and direct."  Fed. R. Civ. P. 8(d)(1).  "Although [Rule] 8 does not demand that a

complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a

minimum, that a complaint give each defendant 'fair notice of what the plaintiff's claim is and

the ground upon which it rests.'"  *Atuahene*, 10 F. App'x at 34 (quoting *Ferro v. Ry. Express*

*Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)).  "Dismissal under Rule 8(a) 'is usually reserved

for those cases in which the complaint is so confused, ambiguous, vague, or otherwise

unintelligible that its true substance, if any, is well disguised.'"  *Bancorp Servs., LLC v. Am.*

*Gen. Life Ins. Co.*, No. 14-cv-09687 (VEC), 2016 WL 4916969, at *5 (S.D.N.Y. Feb. 11, 2016)

(quoting *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004)).

Here, the Plaintiffs plainly specify the Defendants against which they bring each of their

17 claims. *See, e.g.*, Compl. at 25 ("First Claim for Relief . . . By Each Plaintiff Against All

Defendants for Violations of the Trafficking Victims Protection Reauthorization Act (the

'TVPRA')" (further capitalization and emphasis omitted)); *id.* at 47 ("Sixteenth Claim for

Relief . . . By Each Plaintiff Against Eiffel Reddings, LLC, Marie Eiffel, LLC, and/or Reddings

Market, LLC for Negligent Hiring, Retention, and Supervision" (further capitalization and

emphasis omitted)); *id.* at 48 ("Seventeenth Claim for Relief . . . By Each Plaintiff Except Ai,

Samantha, and Victor Against Marie for Battery" (further capitalization and emphasis omitted)).

In any event, "nothing in Rule 8 prohibits collectively referring to multiple defendants where the

complaint alerts defendants that identical claims are asserted against each defendant." *Vantone*

*Grp. LLC v. Yangpu NGT Indus. Co.*, No. 13-cv-07639 (LTS), 2015 WL 4040882, at *3

(S.D.N.Y. July 2, 2015) (brackets and citation omitted). While "this technique muddles the

clarity of the allegations," the Complaint does "not rise to the level of a Rule 8 violation"

because it "gives the defendants notice of the claims asserted against them." *Id.* at *4. The

Eiffel Defendants "can readily identify the nature of the case" brought against them. *Id.*

*Atuahene*, on which the Eiffel Defendants rely, is distinguishable. *See* Br. at 6. There,

the plaintiff sued multiple defendants but did not differentiate among the defendants or identify a

factual basis for the claims. *See* 10 F. App'x at 34. After giving the plaintiff two chances to

distinguish among the defendants, the court dismissed plaintiff's second amended complaint

because it "still fail[ed] to identify which defendants were alleged to be responsible for which

alleged violations." *Id.* Plaintiffs' Complaint is far more precise and provides sufficient notice under Rule 8 of Plaintiffs' claims to Defendants.

## B. TVPRA

The Court moves next to the merits of Plaintiffs' claims and starts with their claims under the TVPRA. The statute provides a private right of action to any "individual who is a victim of a violation of" the TVPRA. 18 U.S.C. § 1595(a). Here, Plaintiffs claim that Defendants violated the TVPRA in four ways: (1) forced-labor violations under 18 U.S.C. § 1589; (2) trafficking with respect to forced labor under 18 U.S.C. § 1590; (3) knowingly benefitting from such a venture under 18 U.S.C. § 1593A; and (4) conspiracy to violate the TVPRA under 18 U.S.C. § 1594. *See* Compl. ¶¶ 172-180. The Eiffel Defendants argue that Plaintiffs have failed to state a TVPRA claim under Rule 12(b)(6). *See* Br. at 7-9. Because 18 U.S.C. §§ 1589, 1590, 1593A, and 1594 provide distinct bases for liability, the Court addresses them separately below. *See Baldia v. RN Express Staffing Registry LLC*, 633 F. Supp. 3d 693, 704-11 (S.D.N.Y. 2022) (taking this approach).

### 1. Forced-Labor Claims Under 18 U.S.C. § 1589

A defendant is liable for forced labor under the TVPRA when she "knowingly provides or obtains the labor or services of a person" by any of the following means:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).

The Complaint invokes the second and fourth subsections of Section 1589(a).  Compl.

¶¶ 174-175.  The Court considers each in turn.

> a.  Serious Harm Under Section 1589(a)(2)

The TVPRA defines "serious harm" as:

> [A]ny harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2); *see Paguirigan v. Prompt Nursing Emp. Agency, LLC*, No. 17-cv-01302

(NG), 2019 WL 4647648, at *15 (E.D.N.Y. Sept. 24, 2019) (Section 1589(c)(2) "defines serious

harm broadly and includes financial harm as a means by which someone can be threatened under

the TVPA"), *aff'd in part, appeal dismissed in part*, 827 F. App'x 116 (2d Cir. 2020) (summary

order).

"[T]he relevant question under § 1589(c)(2) as applied to § 1589(a)(2) is whether

'defendants' conduct constituted a threat of harm serious enough to compel a reasonable person

of the same background and in the same circumstances to perform or to continue performing

labor or services in order to avoid incurring that harm.'"  *Magtoles v. United Staffing Registry,*

*Inc.*, 665 F. Supp. 3d 326, 359 (E.D.N.Y. 2023) (further quotation marks omitted) (quoting

*Paguirigan*, 2019 WL 4647648 at *16).  This standard is a "hybrid" one.  *Anora v. Oasis Pro.*

*Mgmt. Grp., Ltd.*, No. 19-cv-11732 (LJL), 2023 WL 2307180, at *8 (S.D.N.Y. Mar. 1, 2023)

(quoting *Hongxia Wang v. Enlander*, No. 17-cv-04932 (LGS), 2018 WL 1276854, at *5

(S.D.N.Y. Mar. 6, 2018)).  "A factfinder may 'consider the particular vulnerabilities of a person

in the victim's position but her acquiescence must be objectively reasonable under the

circumstances.'" *Hongxia Wang*, 2018 WL 1276854, at *5 (brackets and ellipsis omitted) (quoting *United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015)).

      Plaintiffs have adequately alleged that Defendants knowingly obtained their labor by a threat of serious harm.  To participate in the Summer Work Travel program, Plaintiffs paid a slew of fees and costs to InterExchange and paid their own way to travel to the United States. Compl. ¶¶ 52-64.  To cover these expenses, Plaintiffs borrowed money – for some, thousands of dollars – from their parents.  *Id.* ¶ 51.  The Eiffel Defendants kept Plaintiffs in financial limbo by requiring them, before starting work, to sign a Handbook containing a non-compete clause and stating that Plaintiffs would not receive their tips until completing their term at the Market.  *Id.* ¶¶ 70-71; Handbook at 3.  Eiffel and her managers also threatened to withhold Plaintiffs' tips if they felt, in their discretion, that Plaintiffs were not working to their satisfaction.  Compl. ¶¶ 155-157.  The nature of the Summer Work Travel program was such that Plaintiffs, as J-1 workers, had few other opportunities to earn money in the United States; Celine and Vannessa requested alternative placements from InterExchange, but the options offered were not easily accessible from where they lived.  *Id.* ¶ 166.  Therefore, Plaintiffs faced a difficult choice: continue working at the Market under an allegedly abusive employer or quit with their J-1 visa in doubt, no other opportunity to earn money, and all their tips forfeited.  These circumstances could compel a reasonable person in Plaintiffs' position "to perform or to continue performing labor or services in order to avoid incurring that harm."  18 U.S.C. § 1589(c)(2); *see Baldia*, 633 F. Supp. 3d at 707 (fact that Filipino immigrant "paid many of the costs of her recruitment, including the fees and costs associated with her immigration petition, and her travel expenses for the flight from the Philippines to New York" was relevant to serious-harm analysis); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 438 (E.D.N.Y. 2017) ("The threat of financial harm

constitutes serious harm within the meaning of the TVPA."); *United States v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011) (employer's threat that a foreign domestic worker would owe $8,000 if she left her employment constituted a threat of "serious harm" under the TVPA); *Francis v. APEX USA, Inc.*, 406 F. Supp. 3d 1206, 1211-12 (W.D. Okla. 2019) (serious harm alleged where J-1 workers "could not [otherwise] pay their living expenses in Oklahoma, repay the debts they incurred to secure the employment, or afford travel home" and where defendants "engaged in conduct which precluded them from obtaining other employment").

The Eiffel Defendants assert that Eiffel's threats to withhold tips cannot amount to serious harm where Plaintiffs "*did* receive their tips when the program ended." Br. at 9. However, whether Plaintiffs eventually received their tips at the end of their term bears little on whether Eiffel's threats throughout the summer to withhold those tips coerced Plaintiffs into their continued labor. Both serious harm *and* threats of serious harm fall within the scope of the TVPRA. *See* 18 U.S.C. § 1589(a)(2).

The Eiffel Defendants also argue that Eiffel's threats were "permissible warnings about adverse, legitimate consequences." Reply at 4 ("Where a worker becomes unhappy about his job, quits, [and] awaits a trip home with a debt to repay does not amount to forced labor or fraud because that employee bargained for that deal."). This premise fails for several reasons. First, the Court doubts, for the reasons given *infra* Discussion § I(D), that the Handbook's provision withholding tips is enforceable under New York law – a point that distinguishes some of the Eiffel Defendants' cited cases. *See* Reply at 4-5 (citing *Carter v. Paschall Truck Lines, Inc.*, No. 18-cv-00041, 2023 WL 359559, at *8 (W.D. Ky. Jan. 23, 2023) ("For 'financial harm' to be sufficiently 'serious,' it must be in some way improper or illicit." (further quotation marks and citation omitted)); and *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, No. 10-cv-

01341 (JFB), 2012 WL 748760, at *7 (E.D.N.Y. Mar. 7, 2012) (threats to fire plaintiffs or berating plaintiffs in public for not finishing their work are "threats of adverse but legitimate consequences" that "do not constitute forced labor")).  Second, in one of the Eiffel Defendants' other cases, the court held that the plaintiffs, who "voluntarily incurred debt to join a teaching program," nevertheless stated a TVPRA claim.  *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1145-46 (C.D. Cal. 2011).  Third, the legal validity of the Handbook matters little where Eiffel wielded it as a threat to obtain Plaintiffs' continued labor.  What matters is that "a reasonable person of the same background and in the same circumstances" could think that she needed to complete her term or forfeit her compensation.  18 U.S.C. § 1589(c)(2); *see Baldia*, 633 F. Supp. 3d at 706 ("With respect to enforceability, 'a foreign citizen recruited to a job opportunity in this country may not have a deep (or any) understanding of the legal system or their rights under that system.  As a result, the *in terrorem* effect of an unenforceable contractual provision may well provide a form of 'compulsion' for that foreign citizen to remain in their job, no matter how distasteful that job has become to them.'" (brackets and ellipsis omitted) (quoting *Magtoles v. United Staffing Registry, Inc.*, No. 21-cv-01850 (KAM), 2021 WL 6197063, at *4 (E.D.N.Y. Dec. 30, 2021))).

In light of Eiffel's threats, the circumstances of the Summer Travel Work program, their status as foreign nationals who incurred debt to work at the Market, and the withholding of their tips, Plaintiffs have stated a TVPRA claim under Section 1589(a)(2) to survive a motion to dismiss.  Whether Plaintiffs will *prevail* on their TVPRA claims is an entirely different question – and may turn on, among other things, the amount of withheld tips at issue in proportion to Plaintiffs' base wages – but it is not one that the Court is currently equipped to answer, absent a more well-developed record.

b.   Scheme, Pattern, or Plan Under Section 1589(a)(4)

Plaintiffs also state a claim under 18 U.S.C. § 1589(a)(4), which prohibits a defendant from providing or obtaining labor "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."  18 U.S.C. § 1589(a)(4).  As discussed above, the Complaint plausibly alleges that the terms of Plaintiffs' contracts – especially the terms requiring the belated payment of tips and requiring Plaintiffs to sign confidentiality and non-compete agreements – and Eiffel's continued threats to withhold tips collectively satisfy the threshold of serious harm.  Further, Defendants' conduct – including their recruiting of J-1 workers and their imposition of the Handbook's terms – "could plausibly be understood as a scheme to convince [Plaintiffs] that [they] would be harmed" if they left the Market or sought information on their tips.  *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93 (2d Cir. 2019).

The Eiffel Defendants contend that Plaintiffs "fail[] to plead the necessary element of intent for bringing a claim under Section 1589(a)(4)."  Br. at 9.  The paragraph "'contains a second scienter requirement,' requiring a showing that the defendant knowingly used a scheme, plan, or pattern 'intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm.'"  *Baldia*, 633 F. Supp. 3d at 710 (quoting *Magtoles*, 2021 WL 6197063, at *9).  "[T]he linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her if she left her employment."  *Id.* (further quotation marks omitted) (quoting *Paguirigan*, 286 F. Supp. 3d at 438).

The Court concludes that the facts alleged in the Complaint support a plausible inference that Defendants intended Plaintiffs to believe that they would suffer serious harm if they stopped

working for the Market.  *See Magtoles*, 2021 WL 6197063, at \*9.  In *Magtoles*, Filipino nurses

sued their employer and his company under Section 1589(a)(4).  *Id.* at \*1, \*3.  Noting the

allegation that the defendants' "standard employment contract" included a "liquidated damages

provision, non-compete clause, and immigration notification provision," the court held that the

plaintiffs had sufficiently pleaded intent for purposes of Section 1589(a)(4).  *Id.* at \*9.  For the

*Magtoles* court, the defendants' "incorporation of these facially dubious provisions into the

contracts, when combined with their alleged efforts to enforce the contracts, support a plausible

inference that Defendants intended to coerce [the p]laintiffs into continuing to work for" them.

*Id.* (citation omitted).  Eiffel's Handbook imposed similar terms on Plaintiffs.  Through a

contract that Plaintiffs had no ability to negotiate, the Eiffel Defendants required confidentiality,

enforced a non-compete clause, and withheld Plaintiffs' tips for months, all the while threatening

to fire Plaintiffs for questioning Eiffel's behavior or inquiring about the tips that they had earned.

Compl. ¶¶ 72, 74, 136.  This conduct can plausibly be understood as a scheme to convince

Plaintiffs that they would be financially harmed if they left work at the Market or asked for their

tips.  *See Adia*, 933 F.3d at 93-94 (defendants' threat to withdraw plaintiff's visa sponsorship

plausibly understood as a scheme to convince plaintiff that he would be deported if he left or

asked for overtime pay).  Therefore, Plaintiffs have stated a TVPRA claim under Section

1589(a)(4).

### 2.  *TVPRA Claims Under Sections 1590, 1593A, and 1594*

The Eiffel Defendants' challenges to Plaintiffs' TVPRA claims under Sections 1590,

1593A, and 1594 warrant little attention.  The Eiffel Defendants state only that Plaintiffs "do not

meet their burden under Rule 8(a)(2) or *Twombly* and *Iqbal*" in pleading these claims.  Br. at 7.

This "single, conclusory, one-sentence argument is insufficient to raise an issue in the first

instance." *In re Lottery.com, Inc. Sec. Litig.*, --- F. Supp. 3d ----, 2024 WL 454298, at *28 n.8

(S.D.N.Y. Feb. 6, 2024) (citation omitted).

In any event, Plaintiffs have sufficiently pleaded each element of their claims under

Sections 1590, 1593A, and 1594. Section 1590 makes it unlawful to "knowingly recruit[],

harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in

violation of" the TVPRA. 18 U.S.C. § 1590(a). "[I]f a defendant violates section 1589, he also

violates section 1590 if he recruited the person to perform forced labor." *Adia*, 933 F.3d at 94.

Here, Plaintiffs allege that Defendants recruited them to InterExchange's Summer Work Travel

program in the United States. Compl. ¶¶ 49-50, 52, 55, 58, 61. As discussed above, Plaintiffs

have alleged claims under Section 1589(a). Plaintiffs' "well-pl[ead]ed claims under Section

1589(a) and the . . . Complaint's allegations concerning Defendants' recruitment of [them] are

sufficient to state a claim for trafficking." *Baldia*, 633 F. Supp. 3d at 711; *see Walia v. Veritas*

*Healthcare Sols.*, *L.L.C.*, No. 13-cv-06935 (KPF), 2015 WL 4743542, at *5 (S.D.N.Y. Aug. 11,

2015) ("[B]ecause Plaintiff's claims of forced labor . . . survive the motion to dismiss, so too do

his claims under 18 U.S.C. § 1590(a).").

Under Section 1593A:

> Whoever knowingly benefits, financially or by receiving anything
> of value, from participation in a venture which has engaged in any
> act in violation of this chapter, knowing or in reckless disregard of
> the fact that the venture has engaged in such violation, shall be
> fined under this title or imprisoned in the same manner as a
> completed violation of such section.

Plaintiffs allege that Defendants knowing received benefits from Plaintiffs' participation

in the Summer Work Travel program, including (1) "having J-1 workers recruited from abroad";

(2) "receiving application and recruitment fees from J-1 workers such as Plaintiffs"; (3) "rental

income from Plaintiffs"; and (4) "having cheap and easily exploitable labor available to staff

Defendants' businesses."  Compl. ¶ 179.  Because the Eiffel Defendants do not address any elements of Section 1593A in their motion to dismiss, the Court finds these allegations sufficient to state a Section 1593A claim.

Section 1594 states that "[w]hoever conspires with another to violate section[s] . . . 1589 [or] 1590 . . . shall be punished in the same manner as a completed violation of such section."  18 U.S.C. § 1594(b).  Plaintiffs allege that "Defendants worked in partnership with the Recruiters to implement a scheme of fraudulent recruitment practices, designed to induce Plaintiffs into making significant financial investments to enter into employment contracts with Defendants abroad.  Defendants used the financial vulnerability created by this recruitment scheme, along with the restrictive terms of the J-1 program, to obtain the labor of Plaintiffs."  Compl. ¶ 180. The Eiffel Defendants do not address this allegation in their motion to dismiss.

Accordingly, the Eiffel Defendants' motion to dismiss is denied as to Plaintiffs' TVPRA claims under Sections 1590, 1593A, and 1594.

### C.  NYSHRL

The Court next turns to Plaintiffs' hostile-work-environment claims under the NYSHRL. Hostile-work-environment claims under that statute have long been "governed by the same standard" as Title VII claims.  *Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013); *accord Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998, 1010 (N.Y. 2004).  However, "[t]he New York State Legislature passed several amendments to the NYSHRL in June 2019, the effect of which is to render the standard for claims closer to the standard of the NYCHRL." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021). "Significantly, . . . these amendments only apply to claims that accrue on or after the effective date of October 11, 2019."  *Id.*  Because Plaintiffs' claims all accrued after this date, the amended NYSHRL applies.  *See* Compl. ¶¶ 10-11, 13-17, 79, 83, 92, 102, 108, 117, 121, 149.

The Eiffel Defendants fail to address this amendment, instead applying the wrong, pre-amendment standard in their briefs. *See* Br. at 9-10; Reply at 5-6.

"The case law has yet to definitively resolve whether the NYSHRL's liability standard is now coextensive with that of the NYCHRL, or whether it requires more, so as to impose a standard between federal and city law." *Stinson v. Morningstar Credit Ratings, LLC*, No. 22-cv-06164 (JLR), 2024 WL 3848515, at *21 (S.D.N.Y. Aug. 16, 2024) (ellipsis omitted) (quoting *Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 451 (S.D.N.Y. 2023)). The Eiffel Defendants do not meaningfully engage with this issue, but "New York courts have implied that the standards for claims under the NYSHRL and the NYCHRL are now largely the same," and "the language of the NYSHRL is now nearly identical to that of the NYCHRL." *Id.* (citation omitted). These facts "suggest that the NYSHRL and the NYCHRL are coextensive, at least as to conduct after October 11, 2019." *Id.*; *see id.* (assuming the amended NYSHRL imposes the same hostile-work-environment standard as that of the NYCHRL); *Wheeler*, 694 F. Supp. 3d at 452 (same). The Court will assume that the amended NYSHRL tracks the NYCHRL for Plaintiffs' claims, without prejudice to the Eiffel Defendants' right to later attempt to demonstrate that the NYSHRL sets a more rigorous standard.

"Under the NYCHRL, the standard for a hostile-work-environment claim is the same as for a discrimination claim." *Doolittle v. Bloomberg L.P.*, No. 22-cv-09136 (JLR), 2023 WL 7151718, at *8 (S.D.N.Y. Oct. 31, 2023). "A plaintiff need only show that she was treated less well, at least in part for a discriminatory reason." *Verne v. N.Y.C. Dep't of Educ.*, 697 F. Supp. 3d 30, 59-60 (S.D.N.Y. 2023) (ellipsis, quotation marks, and citation omitted). "Under this standard, the conduct's severity and pervasiveness are relevant only to the issue of damages." *Mihalik v. v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013); *see*

*Verne*, 697 F. Supp. 3d at 61 ("The NYCHRL dispenses with the federal 'severe and pervasive' test; instead, a plaintiff bringing a hostile work environment claim under New York City law must 'prove by a preponderance of the evidence that she has been treated less well than other employees because of her protected status.'" (brackets omitted) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009))).  Nevertheless, Plaintiffs "still bear[] the burden of showing that the conduct is caused by a discriminatory motive." *Mihalik*, 715 F.3d at 110.  "It is not enough that a plaintiff has an overbearing or obnoxious boss.  She must show that she has been treated less well at least in part '*because of* her [protected characteristic].'" *Id.* (citation omitted).

Guided by these standards, the Court concludes that Celine, Vannessa, Ai, and Lew have adequately pleaded NYSHRL hostile-work-environment claims.  Their allegations create a plausible inference that Eiffel treated them less well due to their race and/or national origin.  For example, Eiffel routinely called Celine, Vannessa, and Lew the "Asian Girls."  Compl. ¶ 127. She made fun of Ai's "narrow" eyes and often pulled her own eyes to mock Ai's ethnicity.  *Id.* ¶ 126.  On several occasions, Eiffel made derogatory comments plainly tied to these Plaintiffs' race and/or national origin.  *See id.* ¶ 129 (Eiffel told Celine that she had a "fake smile" and was not "as bubbly and expressive as Americans"); *id.* ¶ 132 (Eiffel told Celine, Vannessa, and Lew that "Asians are not welcomed by white people, 'just like the blacks'"); *id.* ¶ 133 (Eiffel also said to Celine, Vannessa, and Lew that "Asians have a yellow face and are expressionless"); *id.* ¶ 143 (Eiffel told Vannessa she "looked terrible" in a dress because the dress was designed to be worn by tall women with blonde hair).

The Court also concludes that Samantha and Natalia have stated NYSHRL hostile-work-environment claims.  Eiffel is alleged to have groped, kissed, choked, and manhandled only

female employees, supporting Plaintiffs' suggestion that Eiffel directed this physical abuse at female employees. *See id.* ¶ 82 (kissing Samantha); *id.* ¶¶ 88-89, 98-99 (groping Celine's and Vannessa's breasts); *id.* ¶¶ 91, 101 (choking Celine and Vannessa); *id.* ¶ 94 (touching Vannessa's anus); *id.* ¶ 114 (dragging Natalia into kitchen); *id.* ¶¶ 124-125 (putting hands on Ai's face, aggressively shaking Ai's head, and pulling Ai's hair). These allegations suggest that Eiffel particularly violated the personal boundaries of her female employees. *See Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 59 (1st Dep't 2012) (defendant's "comments and emails objectifying women's bodies and exposing them to sexual ridicule . . . clearly signaled that defendant considered it appropriate to foster an office environment that degraded women"). Therefore, Samantha and Natalia – along with Celine, Vannessa, Ai, and Lew – have stated sex-related hostile-work-environment claims.

Felipe has also stated a plausible NYSHRL hostile-work-environment claim. He alleges that Eiffel routinely spanked him. Compl. ¶¶ 118-119. Plaintiffs also allege that Eiffel yelled at Ai for greeting her in Spanish, forbade Ai from speaking Spanish, and told another employee that "no one wants to speak Spanish and *no one wants to be born Spanish*." *Id.* ¶ 145 (emphasis added). A factfinder could plausibly infer from these remarks – and from Eiffel's statements disparaging other Plaintiffs for their race and/or national origin – that she harbored prejudice toward people born in Spanish-speaking countries and spanked Felipe because of, at least in part, his country of origin, Colombia. *See id.* ¶ 15; *Brewer v. City of Poughkeepsie*, 447 F. Supp. 2d 342, 351 (S.D.N.Y. 2006) ("[C]omments referencing [the] plaintiff's country – as opposed to simply comments about her language – . . . provide some basis on which the jury could conclude that the hostility directed at [the] plaintiff was based, not only on the language she spoke, but also on her Cuban national origin." (emphasis omitted)); *cf. Pacheco v. N.Y. Presbyterian Hosp.*,

593 F. Supp. 2d 599, 612 (S.D.N.Y. 2009) (in determining whether a language-restriction policy "reflect[s] an intent to discriminate on the basis of . . . race and national origin," courts "consider, among other facts, whether there is evidence that the employer, in addition to adopting an English-only policy, has exhibited other forms of racial or ethnic hostility").

The Court does not find, however, that Victor has alleged any facts showing that he was treated less well because of his membership in a protected class.  Victor, as the Eiffel Defendants note, alleges no instances of mistreatment at all.  *See generally* Compl.  Therefore, the Court grants the Eiffel Defendants' motion to dismiss Victor's NYSHRL claim.[4]

### D.  New York Labor Law

The Court next turns to Plaintiffs' NYLL claims for spread-of-hours pay and withheld tips.

#### 1.  *Spread-of-Hours Claims*

Under New York law, an employee's "spread of hours is the length of the interval between the beginning and end of an employee's workday."  12 N.Y.C.R.R. § 146-1.6.  "The NYLL requires employers to pay an employee who works a spread of hours in excess of ten an additional hour at the minimum wage rate."  *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481,

---

[4] The Court also agrees with the Eiffel Defendants that Victor has failed to state a claim against them for negligent hiring, retention, and supervision.  *See* Br. at 2; Reply at 1.  Plaintiffs stake their claims for negligent hiring, supervision, and retention on Eiffel's tortious conduct as also alleged in support of their NYSHRL claims.  *See* Compl. ¶¶ 319-320 (alleging that the Eiffel Defendants' LLCs "knew or should have known that [Eiffel] had a propensity to engage in sexual violence, discrimination, and harassment" but nevertheless "permitted [her] to perpetrate sexual violence, discrimination, and harassment upon Plaintiffs").  Victor, however, alleges no such acts by Eiffel against him.  Consequently, the motion to dismiss is granted as to Victor's negligent hiring, retention, and supervision claim.  The Court does not otherwise address these claims as brought by the other Plaintiffs because the Eiffel Defendants have not moved to dismiss them.

500 (S.D.N.Y. 2017) (quotation marks and citation omitted), *aff'd*, 752 F. App'x 33 (2d Cir. 2018) (summary order).

On each day where the spread of hours exceeds 10, "an employee shall receive one additional hour of pay at the basic minimum hourly rate." 12 N.Y.C.R.R. § 146-1.6(a). The section applies "to all employees in restaurants . . . , regardless of a given employee's regular rate of pay." *Id.* § 146-1.6(d). The Eiffel Defendants do not dispute that the Market is a restaurant where Plaintiffs worked. Rather, they argue that several Plaintiffs have not alleged facts supporting their claims, while the remaining Plaintiffs' claims are conclusory. *See* Br. at 11.

The Court disagrees. For four Plaintiffs – Celine, Vannessa, Natalia, and Victor – the Complaint states the precise number of days each month that they worked "in excess of 10 hours." Compl. ¶ 149. The other Plaintiffs tie their claims to these numbers, alleging that they "similarly worked in excess of 10 hours almost every day they worked at the Market." *Id.* ¶ 150. Plaintiffs also allege that their InterExchange "Job Offer[s]" stated that they would work at least 65 hours per week at the Market and that overtime laws applied. *Id.* ¶¶ 67-68. No Plaintiff received spread-of-hours pay. *Id.* ¶¶ 148, 265. With all inferences drawn in Plaintiffs' favor, these allegations are enough to support an inference that each Plaintiff worked over 10 hours in a given day for which he or she did not receive spread-of-hours pay. *See Pineda v. Tokana Cafe Bar Restorant Inc.*, No. 16-cv-01155 (JPO), 2017 WL 1194242, at *2-3 (S.D.N.Y. Mar. 30, 2017) (allegations that plaintiffs "worked a regular schedule of over eighty hours per week" sufficient to establish liability for spread-of-hours claim under the NYLL); *Spiciarich v. Mexican Radio Corp.*, No. 15-cv-00851, 2017 WL 1194017, at *6 (N.D.N.Y. Mar. 30, 2017) (same for allegation that plaintiff "alleges that he regularly worked at least one 14-plus hour double shift a

week and that he did not receive any additional compensation above his standard shift pay"
during certain weeks).

Arguing that Plaintiffs' spread-of-hours allegations are conclusory, the Eiffel Defendants
point to *Lundy v. Catholic Health System of Long Island Inc.*, 711 F.3d 106 (2d Cir. 2013), and
*Nakahata v. New York-Presbyterian Healthcare System*, 723 F.3d 192 (2d Cir. 2013). *See* Br. at
11; Reply at 6. In *Lundy*, the Second Circuit affirmed the dismissal of the plaintiffs' overtime
claims because the plaintiffs did not allege "a single workweek in which they worked at least 40
hours and also worked uncompensated time in excess of 40 hours." 711 F.3d at 114. In
*Nakahata*, the Second Circuit affirmed the dismissal of an FLSA overtime claim where the
plaintiffs alleged that they "regularly worked hours both under and in excess of forty per week
and were not paid for all of those hours." 723 F.3d at 199. The Second Circuit held that these
allegations did not provide "sufficient facts to make it plausible that the[ plaintiffs] worked
uncompensated hours in excess of 40 in a given week." *Id.* at 201. The court added that a
plaintiff "must provide sufficient detail about the length and frequency of their unpaid work to
support a reasonable inference that they worked more than forty hours in a given week." *Id.*

Neither *Lundy* nor *Nakahata* addressed NYLL spread-of-hours claims. In any event,
Plaintiffs plead allegations more specific than those deemed inadequate in those cases. Unlike
the *Lundy* plaintiffs who claimed that they "occasionally" or "often" worked longer shifts, 711
F.3d at 114-15, four Plaintiffs here state the precise number of days during which they worked
over 10 hours and for which they did not receive spread-of-hours pay, Compl. ¶ 149. The other
four Plaintiffs "similarly" worked over 10 hours for "virtually all" of their workdays. *Id.* ¶ 150.
All eight Plaintiffs signed "Job Offer[s]" stating that they would work "at least 65 hours per
week," *Id.* ¶¶ 67-68. That Samantha, Felipe, Ai, and Lew do not allege the exact number of days

that they worked for over 10 hours does not render their claims conclusory, especially where they allege that they did so for "virtually all" of their workdays and link their claims to the four other Plaintiffs who *did* plead the precise number of days. *Id.* ¶¶ 149-150. Taken together, these allegations provide "sufficient facts to make it plausible that they worked" over 10 hours on a given day. *Nakahata*, 723 F.3d at 201; *cf. Guzman-Reina v. ABCO Maint., Inc.*, No. 17-cv-01299 (ILG), 2018 WL 264102, at *3-4 (E.D.N.Y. Jan. 2, 2018) (allegations that plaintiff "routinely" worked 45 to 50 hours per week and citing specific weeks in which she worked overtime that went uncompensated were sufficient to survive motion to dismiss); *Cowell v. Utopia Home Care, Inc.*, 144 F. Supp. 3d 398, 400, 404-05 (E.D.N.Y. 2015) (distinguishing *Lundy* and *Nakahata* and finding a plaintiff's allegations that "she regularly worked over fifty hours a week" and "received only straight-time compensation for all hours worked, even for those hours worked over forty" were sufficient to state a claim that she was entitled to overtime pay for those hours). Therefore, the Court denies the Eiffel Defendants' motion to dismiss Plaintiffs' NYLL spread-of-hours claims.

### 2. *Unlawful Retention of Tips*

Plaintiffs also bring claims under the NYLL for the unlawful retention of tips. "New York law . . . prohibits employers from requiring tipped employees to share tips with non-service employees or managers." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 240 (2d Cir. 2011). The NYLL states:

> No employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee.

N.Y. Lab. Law § 196-d.

As Plaintiffs' employer, Eiffel was barred under the NYLL from "accept[ing], directly or indirectly, any part of the gratuities, received by an employee, or retain[ing] any part of a gratuity or of any charge purported to be a gratuity for an employee." *Id.* Nor does it matter, for NYLL purposes, that Eiffel or her managers also engaged in tipped work. "The language of section 196-d is clear: an employer may not accept any part of the gratuities received by an employee or otherwise retain any part of an employee's gratuities." *Abe v. Uezu Corp.*, No. 20-cv-09725 (JPC), 2023 WL 2574050, at *7 (S.D.N.Y. Mar. 18, 2023); *see Chung v. New Silver Palace Rest., Inc.*, 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002) ("[T]he practice of forced sharing of tips with management is . . . an illegal practice, regardless whether or not the members of management were engaged in restaurant services that could be the subject of tipping."); *id.* at 230 ("[S]ection 196-d clearly prohibits part-owner employees who wield such broad managerial authority . . . [,] and who are thus clearly the 'employer,' from sharing tips.").

Despite the NYLL's restrictions, Plaintiffs directly allege that Eiffel sometimes kept Plaintiffs' cash, credit-card, and debit-card tips for herself. Compl. ¶¶ 158-159. Plaintiffs also include allegations from which one could infer that Eiffel unlawfully retained their tips. The Market's manager once told Celine and Lew that they would receive a smaller share of the store's debit tips than other employees because Eiffel did not like how they handled customers. *Id.* ¶ 156. Another manager similarly told Vannessa on the same day that she would receive lower tips than other employees. *Id.* ¶ 157. Another time, Eiffel told employees that she "lost" the cash tips earned that day. *Id.* ¶ 160. The inference from these allegations, drawn in Plaintiffs' favor for purposes of the present motion, is that, by reducing the tips distributed to Plaintiffs, Eiffel or her managers kept a portion of those tips for herself or themselves. *Cf. Munoz v. Grp. US Mgmt. LLC*, No. 22-cv-04038 (MKV), 2023 WL 5390204, at *5 (S.D.N.Y.

Aug. 22, 2023) (allegation that plaintiff's "weekly tip amounts did not vary" and that he received "a flat payment in lieu of the actual gratuities earned" suggest that the defendants may have kept tips earned by the plaintiff). Therefore, Plaintiffs have stated an unlawful-retention claim under the NYLL.

Plaintiffs further state NYLL claims through their allegations that the Eiffel Defendants withheld their tips until the end of the Summer Work Travel program. Plaintiffs allege that they did not receive tips until completing their respective Summer Work Travel program terms. Compl. ¶ 154. The untimely payment of these tips, even if ultimately paid, constitutes its own underpayment under the NYLL. *See* N.Y. Lab. Law § 191(1)(a)(i) ("A manual worker shall be paid weekly and not later than seven calendar days after the end of the week in which the wages are earned."); *Vega v. CM & Assocs. Constr. Mgmt., LLC*, 107 N.Y.S.3d 286, 288 (1st Dep't 2019) ("The moment that an employer fails to pay wages in compliance with section 191(1)(a), the employer pays less than what is required."); *Carrera v. DT Hosp. Grp.*, No. 19-cv-04235 (RA) (KHP), 2021 WL 6298656, at *11 (S.D.N.Y. Nov. 1, 2021) (plaintiff entitled to NYLL liquidated damages for "late paid gratuities" where defendant "remitted Plaintiff's tips received from credit card payments for deliveries made on a monthly basis, instead of on a weekly basis"), *report and recommendation adopted*, 2021 WL 6298654 (S.D.N.Y. Dec. 7, 2021); *see also id.* at *11 n.11 (noting guidance from the New York State Department of Labor that "gratuities from credit cards must be paid no later than the next regularly scheduled pay day" and assuming "that gratuities are wages in the absence of case law or statutory authority to the contrary").

The Eiffel Defendants respond that Plaintiffs agreed through the Handbooks to have their tips withheld. Br. at 11. To the extent that the Eiffel Defendants claim a waiver of Plaintiffs'

untimely-payment claims under N.Y. Labor Law § 191, that statute states that "[n]o employee shall be required as a condition of employment to accept wages at periods other than as provided in this section," N.Y. Lab. Law § 191(2), and authorizes only the Commissioner of Labor to waive the weekly pay requirement for certain employers, *id.* § 191(1)(a)(ii).  To the extent that the Eiffel Defendants claim a waiver of these claims under N.Y. Labor Law § 196-d, "such a contract must be clear as to the waiver of the employees' rights."  *Tamburino v. Madison Square Garden, L.P.*, 980 N.Y.S.2d 83, 86 (1st Dep't 2014).  The Handbook does not mention any statutory right that Plaintiffs had to their tips.  Nor is there any indication that "the purported waivers were . . . negotiated" or "that the employees were aware of the statutory right being waived."  *Altour Serv., Inc. v. Indus. Bd. of Appeals*, 8 N.Y.S.3d 131, 132 (1st Dep't 2015) (employees did not waive their rights to mandatory charges under Section 196-d).  Eiffel required Plaintiffs to sign the Handbook as a condition for working at the Market.  Compl. ¶¶ 151-152.  Each Plaintiff was told that he or she would not receive tips unless they finished their work term.  *Id.* ¶ 153.  Insofar as a waiver of Plaintiffs' rights to the timely payment of tips was permitted, Plaintiffs allege that no such waiver was negotiated in good faith.  *See id.* ¶ 70 ("Prior to beginning work, [Eiffel] *made* each Plaintiff sign" the Handbook (emphasis added)).

Finally, Plaintiffs also state NYLL claims through their allegation that Defendants failed to provide an accurate accounting of the tips that Defendants received from customers.  Under the NYLL's Hospitality Industry Wage Order, "[e]mployers who operate a tip sharing or tip pooling system must establish, maintain, and preserve for at least six years records which include:

> (1) A daily log of the tips collected by each employee on each shift, whether in cash or by credit card; (2) A list of occupations that the employer deems eligible to receive tips through a tip sharing or tip pool system; (3) The shares of tips that each

> occupation is scheduled to receive from tip sharing or tip pooling;
> and (4) The amount in tips that each employee receives from the
> tip share or tip pool, by date.

12 N.Y.C.R.R. § 146-2.17(a).  "Such records must be regularly made available for participants in

the tip sharing or tip pooling systems to review."  *Id.* § 146-2.17(b).  Plaintiffs allege that

Defendants never provided them with an accurate accounting of their tips.  Compl. ¶ 273.

Indeed, Plaintiffs allege that Eiffel refused to provide Plaintiffs with this calculation.  *See id.*

¶¶ 158-159.  She threatened to withhold the tips of – and even threatened to fire – anyone who

asked her about the tips he or she was owed.  *Id.* ¶ 161.  From these allegations, Plaintiffs have

stated claims for violations of 12 N.Y.C.R.R. § 146-2.17.

### E.  Battery[5]

The Eiffel Defendants do not challenge Celine's and Vannessa's battery claims.  *See* Br.

at 12.  Rather, they challenge as time-barred the battery claims of Lew, Felipe, and Natalia.  *Id.*

Under New York law, the statute of limitations for battery is one year.  *See* N.Y. C.P.L.R.

§ 215(3).  Battery claims accrue when they happen.  *See, e.g.*, *Berlin v. JetBlue Airways Corp.*,

436 F. Supp. 3d 550, 565 (E.D.N.Y. 2020) (battery claim "accrued on . . . the date Plaintiff

alleges JetBlue employees physically restrained and attacked him").

Plaintiffs first filed the Complaint on September 1, 2023.  Dkt. 1.  Consequently, any

battery claims that accrued before September 1, 2022 are time-barred.  Lew, Felipe, and Natalia

worked at the Market until September 4, 2022, Compl. ¶¶ 102, 108, 117, and allege that Eiffel

made unwelcome physical contact throughout their time at the Market, *id.* ¶¶ 103, 109, 118.

Consequently, the Eiffel Defendants have not shown that, as a matter of law, the entirety of their

---

[5] With respect to Plaintiffs' and InterExchange's common-law claims, "[t]he parties' briefs
assume that New York substantive law governs . . . , and such implied consent is . . . sufficient to
establish the applicable choice of law."  *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39
(2d Cir. 2009) (citation omitted).

battery claims are untimely.  At most, the Eiffel Defendants have highlighted an issue at the
summary-judgment stage as to whether these three Plaintiffs can prove that instances of battery
occurred between September 1, 2022, and their departure on September 4, 2022.  At the pleading
stage, however, the Court draws all permissible inferences in Plaintiffs' favor and concludes that
their battery claims survive the motion to dismiss.

## II.    InterExchange's Crossclaims

InterExchange brings crossclaims against the Eiffel Defendants for indemnification and a
breach of contract.  Crosscl. ¶¶ 25-41.  The Court considers each crossclaim in turn.

### A.    Indemnification Claim

The Eiffel Defendants challenge InterExchange's indemnification crossclaim as unripe.
*See* Crosscl. Br. at 5-6.  According to them, "[t]he right to indemnity does not arise until after
there is a final judgment or settlement."  *Id.* at 6.  InterExchange responds that a ripe and actual
controversy exists at least as to its requested indemnity for attorney's fees.  *See* Crosscl. Opp. at
4-5.

"Generally, claims concerning indemnification obligations are not ripe for adjudication
until liability has been imposed upon the party to be indemnified."  *Mura v. Thomas*, No. 19-cv-
8699 (AEK), 2021 WL 4481346, at *8 (S.D.N.Y. Sept. 30, 2021) (citation omitted); *see Harris
v. Rivera*, 921 F. Supp. 1058, 1062 (S.D.N.Y. 1995) ("Claims for indemnification do
not generally ripen until a judgment in the underlying action is paid.").  "[C]ourts have generally
taken two approaches when third[ parties] assert indemnification claims before judgment."
*Cucchiara v. Hollingsworth*, No. 15-cv-00314 (KBF), 2016 WL 6068193, at *8 (S.D.N.Y. Oct.
14, 2016).  Some have "dismissed the indemnification cross-claim as not ripe, requiring plaintiff
to file suit in state court after judgment was rendered."  *Id.* (citing *Nevares v. Morrissey*, No. 95-
cv-01135 (JGK), 1998 WL 265119, at *7 (S.D.N.Y. May 22, 1998)).  "Other courts have

permitted defendants to assert indemnification cross-claims before they are technically ripe in order to promote fairness and judicial economy, but have deferred consideration of the indemnification cross-claim until after a verdict as to liability has been entered." *Id.* (quotation marks and citation omitted); *see Isaacs v. City of New York*, No. 17-cv-03957 (ARR), 2019 WL 1208787, at *7 (E.D.N.Y. Mar. 13, 2019) ("Though some courts have chosen to dismiss indemnification cross-claims as unripe, it is far more common for courts in this circuit to retain jurisdiction over a technically unripe indemnification claim in the interests of judicial economy and fairness." (citation omitted)).

To the extent that InterExchange seeks contractual indemnification for its attorney's fees in this action, that claim is ripe for adjudication. *See Convergent Wealth Advisors LLC v. Lydian Holding Co.*, No. 12-cv-01199 (SAS), 2012 WL 2148221, at *6 (S.D.N.Y. June 13, 2012). Even if the remainder of InterExchange's indemnification crossclaims are unripe, the Court declines to dismiss those claims. Instead, the Court finds "that it is far preferable to retain jurisdiction over the claim but defer consideration of the indemnification cross-claim until after a verdict as to liability has been entered." *Isaacs*, 2019 WL 1208787, at *7 (quotation marks, brackets, and citation omitted); *see Choi v. Hoyt Leon Corp.*, No. 19-cv-04445 (MKB), 2023 WL 5671993, at *7 (E.D.N.Y. Sept. 1, 2023) (declining "to adjudicate the indemnification issues prior to any liability determination"); *Hanson v. New York City*, No. 15-cv-01447 (MKB), 2018 WL 1513632, at *23 (E.D.N.Y. Mar. 27, 2018) (denying summary judgment on indemnification claim without prejudice to renewal upon determination of liability because there was "no reason to adjudicate the indemnification issues prior to any liability determination"); *Ki v. City of New York*, No. 20-cv-04343 (ARR), 2021 WL 4902538, at *6 (E.D.N.Y. Oct. 21, 2021) ("[B]ecause [the indemnification] cross claim, if it ripens at all, will not do so until judgment, there is no

reason to adjudicate the indemnification issue prior to any liability determination." (quotation marks, brackets, and citation omitted)); *Catzin v. Thank You & Good Luck Corp.*, No. 15-cv-07109 (KBF), 2017 WL 11675149, at *3 (S.D.N.Y. Jan. 5, 2017) ("[A]ny particular issues regarding the contractual cross-claims under the [indemnification agreement] – including what amounts, if any, may be recovered by [the] cross-claim plaintiff – will be determined following adjudication of the . . . NYLL claims on the merits."). Therefore, the Court denies the Eiffel Defendants' motion to dismiss InterExchange's indemnification crossclaim without prejudice to renewal upon a determination of liability against InterExchange.

### B. Breach-of-Contract Claim

InterExchange alleges that, if the allegations in Plaintiffs' Complaint are true, the Eiffel Defendants breached the Agreements in two ways. First, they "fail[ed] to honor their contractual commitments to [InterExchange] to pay all wages due to [Plaintiffs] under applicable law." Crosscl. ¶ 40. Second, they "engaged in conduct that, if true, would constitute 'illegal activities or activities that may bring the Program or InterExchange into notoriety or disrepute.'" *Id.* ¶ 39 (quoting Agreements at 3, 10).

To state a breach-of-contract claim under New York law, a plaintiff must allege (1) the existence of an agreement; (2) the plaintiff's adequate performance of the contract; (3) the defendant's breach of contract; and (4) damages. *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022); *accord Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023). For each of these elements, the "complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Twombly*, 550 U.S. at 555-56).

The Eiffel Defendants argue that Plaintiffs' first theory of breach fails because InterExchange does not "allege the specific and essential contract terms requiring [the Eiffel

Defendants to pay all wages to Plaintiffs under applicable law." Crosscl. Br. at 16. The Eiffel Defendants also challenge the second theory of breach on the grounds that any damages flowing from InterExchange's "purported notoriety and disrepute" are too speculative. *Id.*

The Court disagrees with the first objection. In the "Hours, Compensation[,] and Housing" section of the Agreements, the Eiffel Defendants agreed to pay their J-1 workers not less than "the applicable Federal, State, or Local Minimum Wage (including applicable overtime payment requirements)." Agreements at 3-4, 10-11 (emphasis omitted). That language plausibly required the Eiffel Defendants to pay Plaintiffs all applicable wages. Therefore, this theory of breach survives the Eiffel Defendants' motion to dismiss.[6]

As for the second theory of breach, InterExchange pleads that it was damaged by the Eiffel Defendants' breach of their contractual obligations to refrain from conduct that brings InterExchange into disrepute. Crosscl. ¶ 41. While InterExchange will eventually have to prove that it has suffered nonspeculative damages, such a loss of business opportunities, the Court – noting the Complaint's inflammatory allegations and drawing all inferences in favor of InterExchange – will not dismiss the claim at this time. *Cf. Joshi v. Trs. of Columbia Univ. in City of N.Y.*, 515 F. Supp. 3d 200, 220 (S.D.N.Y. 2021) (noting at the summary-judgment stage that plaintiff's claims of "a more general diminution of his reputation," as opposed to "any specific business opportunities lost as a result of his allegedly damaged reputation," is

---

[6] InterExchange did not identify this provision in its Crossclaim or opposition brief. Although InterExchange claims it "quoted the exact language of the parties' agreement in support of this allegation," Crosscl. Opp. at 7 (quoting Crosscl. ¶ 13), the provision cited is the Limitation on Liability clause, which stated only that the Eiffel Defendants would indemnify InterExchange from liabilities in connection with, among other things, wage-and-hour claims by participants in the Summer Work Travel program, *see* Crosscl. ¶ 13. InterExchange does not explain how the language of this provision created a requirement to pay Plaintiffs all wages due under applicable law.

"insufficient to obtain damages on a breach of contract claim"), *aff'd*, No. 21-418, 2022 WL 3205883 (2d Cir. Aug. 9, 2022) (summary order).

## CONCLUSION

For the foregoing reasons, the Eiffel Defendants' motion to dismiss Plaintiffs' claims is GRANTED IN PART and DENIED IN PART. Victor's NYSHRL claim is dismissed, along with his claim of negligent hiring, retention, and supervision. Plaintiffs' remaining claims survive. The Eiffel Defendants' motion to dismiss InterExchange's crossclaims is DENIED.

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 31 and 50.

Dated: August 28, 2024
       New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge